

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br><br>CAMERON MOORE-WILLIAMS<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. **4 - 1 9 - 7 0 0 2 0**   *MAG*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____Oct. 11, 2017 to present____ in the county of ____Alameda____ in the

____Northern____ District of ____California____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B); | Conspiracy to manufacture, distribute, or possess with intent to distribute controlled substances, to wit 28 grams or more of cocaine base<br><br>See attached penalty sheet. |

This criminal complaint is based on these facts:

Please see attached affidavit.

Approved as to form: Shiao Lee and Frank Riebli, AUSA _____

☑ Continued on the attached sheet.

FILED

JAN 09 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
OAKLAND OFFICE

_____
*Complainant's signature*

ATF Special Agent Whitney Hameth
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __1/9/19__

_____
*Judge's signature*

City and state: ____Oakland, CA____

Hon. Kandis A. Westmore, U.S. Magistrate Judge
*Printed name and title*

Document No.

District Court
Criminal Case Processing

## PENALTY SHEET – CAMERON MOORE-WILLIAMS

**Offenses Charged:**

Count One:    21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B) -- Conspiracy to manufacture, distribute, or possess with intent to distribute controlled substances, to wit 28 grams or more of cocaine base

**Penalties:**

Count One    5-40 years imprisonment; at least 4 years= supervised release to life; $5 million criminal fine; $100 special assessment; forfeiture.

# AFFIDAVIT OF SPECIAL AGENT WHITNEY HAMETH
# IN SUPPORT OF COMPLAINTS AND SEARCH WARRANTS

I, Whitney Hameth, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), being duly sworn, depose and state:

## I.    INTRODUCTION

1.    I make this affidavit in support of an application for criminal complaints charging the following persons (collectively, the **"Target Subjects"**) with the drug and firearms offenses listed below (collectively, the **"Target Offenses"**), arising from their participation in a conspiracy to sell cocaine powder and/or cocaine base, and their participation in the trafficking of firearms, including machine guns:

      a.     Daniel JAMES, a/k/a "Unk," "D" – 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B); 18 U.S.C. § 922(a)(1)(A); 18 U.S.C. § 922(o);

      b.     Terry WALKER, Sr. – 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B);

      c.     Paul RIVERA, a/k/a "P," "Pzz" – 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B); 18 U.S.C. § 922(g)(1);

      d.     Darrell MURPHY Jr., a/k/a "KD" –18 U.S.C. § 922(a)(1)(A);

      e.     Deshawn LEMONS-WOODARD, a/k/a "Shawn" –18 U.S.C. § 922(a)(1)(A);

      f.     Darryl WASHINGTON, a/k/a "June" – 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B); 18 U.S.C. § 922(a)(1)(A); 18 U.S.C. § 922(g)(1);

      g.     STERLING Walker; a/k/a "Dot," "S. Dot" – 18 U.S.C. § 922(a)(1)(A);

      h.     Vernell THROWER – 18 U.S.C. § 922(g)(1);

      i.     Cameron MOORE-WILLIAMS, a/k/a "Bang," "Banga" – 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B);

      j.     Deantae KENNEDY-PALMER, a/k/a "Taedo" – 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B);

and in support of an application for warrants to search the following locations, described more particularly in Attachments A (collectively, the **"Target Locations"**), for the items specified in Attachments B:

**Target Location A:**  156 Estabrook Street, Apartment #209, San Leandro, California;

**Target Location B:**  2760 Sulphur Drive, Hayward, California;

**Target Location C:**  1754 B Street, Apartment #20, Hayward, California;

**Target Location D:**  1200 Davis St. #25, Oakland, California;

**Target Location E:**  3667 Maybelle Avenue, Apartment #3, Oakland, California;

**Target Location F:**  275 Lee Street, Apartment #12, Oakland, CA;

**Target Location G:**  211 Makin Road, Oakland, CA;

**Target Location H:**  222 Makin Road, Oakland, CA;

**Target Location I:**  2606 MacArthur Blvd, Oakland, CA (Legends Barber Shop);

**Target Location J:**  1519 88th Avenue, Oakland, CA;

**Target Location K:**  3674 Rosebrook Ct., Concord, CA;

**Target Location L:**  22304 City Center Drive, #3412, Hayward, CA;

**Target Location M:**  <not seeking a warrant as to this location at this time>;

**Target Location N:**  3667 Maybelle Avenue, Apartment #1, Oakland, CA;

**Target Location O:**  4 Morton Dr., Daly, City, CA

**Target Location P:**  687 Southmoor Dr., Pacifica, CA

**Target Location Q:**  22525 3rd Street, Apt. 311, Hayward, CA;

**Target Location R:**  2890 Redwood Parkway #141 in Vallejo, CA;[1]

**Target Vehicle 1:**  Silver Chevrolet Impala, CA 7WQC719;

**Target Vehicle 2:**  Black Ford Fusion, CA 6UXK143;

**Target Vehicle 3:**  Gold Mitsubishi Montero, CA 5PLF475;

**Target Vehicle 4:**  Black Mercedes CL 550, CA 7ZLX117;

---

[1]  I am not requesting that this Court issue a warrant to search this location. That location is the subject of a separate warrant I am submitting in the Eastern District of California.

**Target Vehicle 5**: Copper Kia Sportage, CA 7TCV390;

**Target Vehicle 6**: Red Jeep Wrangler, CA 7MNZ154

**Target Vehicle 7**: Red Chevrolet Silverado, CA 8K70999

**Target Vehicle 8**: Red Mercury Grand Marquis 7ZMD907

**Target Vehicle 9**: Silver Mercedes Benz C220 7ELD164

**Target Vehicle 10**: White Acura, CA 4WSU750

**Target Vehicle 11**: Charcoal Grey/Black Audi with paper plates, as described below;

**Target Vehicle 12**: Silver Hyundai Tiburon with paper plates, as described below;

and any computers, cell phones, or other digital media devices found therein or in the **Target Subjects'** possession at the time of their respective arrests and which reasonably appear to belong to persons involved in the offenses described in this affidavit, and to seize certain items that are fruits, evidence, and instrumentalities of violations of the crimes listed above. I further request that this search include all rooms and garages or storage spaces, attached or unattached, that are associated with the **Target Locations**; any containers, locked or unlocked, located within or attached to the **Target Locations**.

2.     The statements contained in this affidavit are based on my own investigation, information provided to me by or through other law enforcement agents, investigators and individuals with knowledge of this matter, through my review of documents related to this investigation, and my training and experience as an ATF Special Agent. This affidavit summarizes such information in order to show that there is probable cause to believe that the **Target Subjects** have committed the **Target Offenses** described above and that the items listed in Attachment B will be found in the **Target Locations**. This affidavit does not purport to set forth all of the evidence gathered to date in this investigation, or to name all of the persons who participated in these crimes.

## II.     AGENT BACKGROUND

3.     I am a Special Agent with ATF and have been so employed since September of

3

2015. I am presently assigned to the ATF Oakland Field Office in Oakland, California. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center and Special Agent Basic Training at the ATF National Academy. The training that I received at the academy included formalized instruction in, among other things, drugs, firearms, and violent crime-related investigations, drug identification and detection, interdiction, familiarization with United States drug and firearms laws, financial investigations and money laundering, identification and seizure of drug and firearms tracking related assets, physical and electronic surveillance, weapon qualification and tactics, operation and use of confidential sources, and undercover operations. Prior to working as an ATF Special Agent, I received a Bachelor of Science degree in Criminal Justice and a Master's of Criminal Justice degree.

4.     As an ATF Special Agent, I have conducted and participated in both state and federal investigations involving the trafficking of firearms and distribution of controlled substances. I have investigated and assisted in the prosecution of criminal street gangs engaged in illegal narcotics and firearms trafficking. During these investigations, I have participated in various types of investigative techniques, including electronic surveillance, undercover agents and informants, and controlled purchases of firearms and narcotics from suspects. I have participated in physical surveillance operations and have participated in the execution of state and federal arrest warrants and search warrants. In addition to using the aforementioned investigative techniques, I have been required during these investigations to analyze information resulting from traditional record searches, GPS location information, pen registers and trap and trace devices, information from an order authorizing the interception of wire and electronic communications of cellular telephones, financial records, utility records, and telephone toll and subscriber records. I have interviewed individuals, as well as conferred with other law enforcement officers about the slang, codes, symbols, graffiti, and dress of gang members, criminals' use of telephones, e-mails, and other methods of communication to conduct their criminal activities, and criminals' use of false and fictitious identities to thwart law enforcement investigation of their activities.

4

## III. RELEVANT STATUTES

5.      21 U.S.C. § 841(a)(1) makes it unlawful for a person to knowingly or intentionally manufacture, distribute, or possess with intent to distribute, controlled substances, including cocaine powder and cocaine base. Distribution of 500 grams or more of cocaine powder, or 28 grams or more of cocaine base, triggers 21 U.S.C. § 841(b)(1)(B)'s statutory minimum sentences.

6.      21 U.S.C. § 846 makes it unlawful for a person to attempt or conspire to manufacture, distribute, or possess with intent to distribute controlled substances, including cocaine powder and cocaine base.

7.      18 U.S.C. § 922(a)(1)(A) makes it unlawful to willfully engage in the business of dealing in firearms without a license.

8.      18 U.S.C. § 922(g)(1) makes it unlawful to be a felon in possession of a firearm or ammunition that has moved in or affects interstate commerce.

9.      18 U.S.C. § 922(o) makes it unlawful to possess or transfer a machine gun. Section 921(a)(23) and 26 U.S.C. § 5845(b), define a machine gun as a weapon which shoots or is designed to shoot automatically more than one shot by a single function of the trigger.

## IV. FACTS ESTABLISHING PROBABLE CAUSE

### A.      Overview of the Investigation

10.      This investigation focuses on a gun- and drug-trafficking network that JAMES and others operate in East Oakland, California, on and around the 200 block of Makin Road. As described below, this investigation has involved controlled purchases of guns and drugs using confidential informants and, on one occasion, an undercover ATF agent ("UC"). One informant ("CI-1")[2] has purchased 34 guns, including two machine guns and two short-barreled rifles, at

---

[2]      The CI-1 used in this investigation has known JAMES for approximately 4 years. CI-1 originally began working with law enforcement to avoid charges after agents contacted him/her after seeing images of firearms on his/her Instagram profile. Agents told CI-1 that they were not intending to pursue criminal charges, but CI-1 elected to continue working with law enforcement

least 1,300 grams of suspected cocaine powder, approximately 545 grams of suspected cocaine base, and over 50 suspected hydrocodone pills from JAMES and his associates. The UC also purchased a firearm.

11.    ATF agents, analysts, and Intelligence Research Specialists conducted queries of the National Licensing System and found that none of the **Target Subjects** or other persons identified in this investigation are licensed to sell firearms. Agents have performed an interstate nexus analysis on the firearms and ammunition the **Target Subjects** possessed and/or sold to CI-1, described more fully below, and with the exception of firearms with unknown manufacturers and model numbers, all other firearms have been determined to have travelled through interstate commerce. Additionally, with the exception of JAMES, LEMONS-WOODARD,[3] MURPHY, MOORE-WILLIAMS, and KENNEDY-PALMER, all other **Target Subjects** had sustained at least one felony conviction prior to engaging in the firearm possession and/or trafficking described in this affidavit.

12.    Based on this investigation and the facts described below, I believe that JAMES controls the sale of drugs and firearms on Makin Road. I believe that numerous individuals work for him distributing drugs and guns, including RIVERA, WASHINGTON, MOORE-WILLIAMS, and KENNEDY-PALMER. It appears that JAMES has organized these men to work in shifts, with one person directing the others' sales during their respective shifts. Thus, I believe that RIVERA runs the day shift, and that he works from approximately 10:00 a.m. to 5:00 p.m. each day selling or directing the sales of drugs, including cocaine base and heroin. I believe that WASHINGTON runs the night shift, and that he works from approximately 5:00

---

for payment. Every time CI-1 completes a transaction, CI-1 receives a payment from ATF. CI-1 has felony convictions for assault with a firearm on a person and felon in possession of a firearm. CI-1 has previous arrests for various offenses, including but not limited to the following: carrying a concealed weapon, manufacture/sale of a large capacity magazine, probation violation, and alter/remove ID mark on firearm. CI-1's information has, to date, been found to be credible and much of it has been corroborated.

[3]    LEMONS-WOODARD sustained a felony conviction on November 1, 2017, after he participated in the gun sales described below.

p.m. until the early hours of the morning, also directing drug sales during that period.

**B.   JAMES Conspired With Others to Distribute Guns and Drugs.**

13.   During the course of this investigation, agents have directed the controlled purchases of guns and drugs listed in the table below.  In each case, CI-1 bought the item(s) listed from the person(s) listed:

| Date | Item Purchased | Seller |
|------|----------------|--------|
| 6/6/17 | TKS Engineering AR15HD, .223/5.56mm cal. rifle, serial no. 0910010<br>9 rounds of 5.56mm ammunition | JAMES, LEMONS-WOODARD |
| 6/13/17 | Glock 23 40 cal. pistol with obliterated serial number | LEMONS-WOODARD |
| 7/18/17 | Glock 19 9mm pistol, serial no. TC928<br>Beretta 84FS Cheetah .380 cal. pistol, serial no. H07025Y<br>High capacity 9mm magazine | LEMONS-WOODARD |
| 9/13/17 | Smith & Wesson SD .40 cal. pistol, serial no. HFJ0152<br>Six rounds of Winchester-Western ammunition | JAMES |
| 9/18/17 | Springfield Armory XD .40 caliber pistol, serial no. US4275<br>10 rounds of assorted .40 caliber ammunition | JAMES |
| 10/11/17 | AR-15 pistol, with no known model or serial number | JAMES |
| | 28.039 grams powder cocaine | JAMES, RIVERA |
| 10/24/17 | Beretta 96 .40 cal. pistol, serial no. BER080602 | JAMES |
| | AR-15 style pistol with no manufacturer markings or serial number | JAMES, Yolanda |
| | Approx. 28.8 grams suspected powder cocaine<br>20 suspected hydrocodone pills | JAMES |
| 11/2/17 | 13.797 grams powder cocaine<br>26.538 grams cocaine base | JAMES, WALKER |
| | Fully automatic Glock 23 .40 cal. pistol, serial no. BAEA916 | JAMES, WASHINGTON, THROWER |
| 11/21/17 | Fully automatic Glock 22 40 cal. pistol, serial no. PZL229 | JAMES |
| | AR-15 style pistol with no markings indicating the manufacturer or serial number | JAMES, STERLING |

| Date | Item | Names |
|---|---|---|
| | Approximately 57.5 grams of suspected cocaine base | JAMES |
| 1/29/18 | 27.5 grams of powder cocaine<br>48.112 grams of cocaine base | JAMES |
| 1/31/18 | Springfield Armory XD .45 caliber pistol, serial no. XD639243 | JAMES, MOORE-WILLIAMS |
| 3/8/18 | Springfield Armory XD .40 cal. pistol, serial no. XD565385 | MURPHY |
| | Approx. one ounce of powder cocaine<br>Approx. one ounce of cocaine base | JAMES, WALKER |
| 3/15/18 | 496.8 grams of powder cocaine | JAMES |
| 6/5/18 | Springfield Armory XD .45 cal. pistol, serial no. XD667617<br>10 rounds of .45 cal. ammunition | JAMES |
| | AR-15 style pistol, unknown manufacturer and model | JAMES, STERLING |
| | 50 suspected hydrocodone pills<br>55.6 grams of powder cocaine | JAMES, WALKER |
| 6/18/18 | Short-barreled rifle, with unknown manufacturer, model, or serial number | RIVERA |
| | Kahr Arms P40 .40 cal. pistol, with an obliterated serial number | MURPHY |
| | Smith & Wesson 9mm pistol, serial no. FWS8802 | JAMES |
| 7/12/18 | Heckler & Koch USP40 .40 cal. pistol, serial no. 22-27117;<br>Beretta 92FS 9mm pistol, serial no. E38985Z<br>Smith & Wesson SD40 VE .40 cal. pistol, serial no. HFW2363<br>Taurus PT99AF 9mm pistol, serial no. TYK51102 | JAMES |
| | 26.883 grams of cocaine base | JAMES |
| 7/31/18 | Two Anderson Manufacturing AM-15 5.56mm cal. pistols with obliterated serial numbers | JAMES |
| | Taurus PT709 Slim 9mm cal. pistol | RIVERA |
| 8/23/18 | Springfield Armory XD40 sub-compact .40 cal. pistol, serial no. US450601<br>Springfield Armory XD40 .40 cal. pistol, serial no. US387906<br>Smith & Wesson M&P .38 cal. pistol, serial no. 9076<br>Unknown mfr, serial no. unknown | MURPHY |
| 10/9/18 | Glock 30 .45 cal. pistol, serial no. CMT960US<br>Glock-type .40 cal. sub-compact pistol, equipped with | JAMES |

| | | |
|---|---|---|
| | Glock 27 slide assembly, serial no. FFF989 | |
| | Approx. two ounces of suspected cocaine base | JAMES |
| | Bryco Arms Jennings Nine 9mm pistol, serial no. 1563705 | JAMES, WASHINGTON |
| 10/11/18 | 504 grams powder cocaine | JAMES |
| 11/25/18 | Unknown manufacturer, AK-Type short barreled rifle Kimber 1911 Ultra Carry II .45 cal. pistol, serial no. KU234373 | JAMES |
| | Approx. one ounce cocaine base Approx. one ounce powder cocaine | JAMES, WALKER |

14.     For the following reasons, I believe that JAMES has worked with others to conduct and direct the sales described above, as well as the day-to-day sales of guns and drugs on Makin Road. For example, CI-1 arranged the June 6, 2017 gun purchase through LEMONS-WOODARD. When CI-1 arrived on Makin Road to buy the gun, LEMONS-WOODARD said that his "uncle" was bringing the gun, that he was only setting up the deal, and it was ultimately JAMES who arrived and sold the gun to the ATF UC that day. JAMES told the UC, "it's money back guarantee, got any problems bring it back, I be here [at Makin Road] everyday."

15.     JAMES directed the November 2, 2017 deal as well. While CI-1 was there, JAMES told WASHINGTON to "hook him up," and pointed to CI-1. WASHINGTON then made a phone call, and a short time later, Vernell THROWER came to Makin Road and sold the gun to CI-1. Following the deal, CI-1 attempted to get WASHINGTON's phone number to reach out to him directly in the future, but WASHINGTON told CI-1 to go through JAMES for future firearm sales. Agents examined the gun WASHINGTON and THROWER sold to CI-1 and determined that it was a fully automatic Glock pistol.

16.     JAMES sold CI-1 another fully-automatic pistol on November 21, 2017. In a text message prior to the deal, JAMES told CI-1 that he "Got an ar an another hand thing with the switch." I believe the references to "ar" and "hand thing with the switch" meant an AR-15 style pistol and a pistol with a switch on the back that made it fully automatic. When CI-1 and JAMES met that day, CI-1 asked about the "fully" and JAMES responded, "I got that." JAMES

retrieved a Glock 22 from his car and sold it to CI-1. Agents examined it and determined that it was a fully automatic Glock pistol.

17.  On January 31, 2018, CI-1 went to Makin Road and found that JAMES did not have any guns to sell. Nonetheless, JAMES told RIVERA to call people to find CI-1 a gun. RIVERA said he would contact "Taedo," which I know to be the street moniker for KENNEDY-PALMER, to see if "Taedo" had a gun ready to sell. Another of JAMES' associates, MOORE-WILLIAMS, who was standing nearby and overheard JAMES' conversation about finding CI-1 a gun, told JAMES that he could sell CI-1 his own "XD." JAMES indicated that the "XD" was his old gun, which I believe means that it was JAMES' personal gun that he had previously given or sold to MOORE-WILLIAMS. MOORE-WILLIAMS then sold CI-1 the pistol.

18.  During the March 8, 2018 transaction, JAMES was not present when CI-1 arrived on Makin Road. Over the phone, JAMES said that he not did have any firearms to sell at the moment, but referred CI-1 to his "nef" and said that his "nef" might be able to help CI-1 find a firearm to buy. I believe the term "nef" is short for "nephew," which is a term JAMES uses to describe some of the younger men selling drugs and guns on Makin road. CI-1 then approached RIVERA and MURPHY to inquire about buying a firearm. MURPHY ended up selling CI-1 a Springfield Armory XD .40 caliber pistol.

19.  Further, CI-1 arranged the June 18, 2018 firearm sale through JAMES and RIVERA, but when CI-1 arrived on Makin Road neither JAMES nor RIVERA was there. CI-1 asked MURPHY, who had just come from inside **Target Location H** if he had any firearms to sell CI-1. MURPHY said that he did, but that CI-1 should spend CI-1's money on the firearms JAMES was selling. I believe this indicates that MURPHY was being careful to ensure that his own gun sale did not prevent CI-1 from buying any guns JAMES had to sell. MURPHY agreed to sell a gun to CI-1 only when CI-1 assured MURPHY that CI-1 had enough money for both. MURPHY then went back inside **Target Location H**, got the gun, and sold it to CI-1.

20.  On the same day, RIVERA sold CI-1 a short-barreled rifle with a bump stock. Toll records for JAMES' phone showed that RIVERA called JAMES right after the sale. Two

minutes after RIVERA's call to JAMES, JAMES called CI-1 and confirmed that RIVERA had sold the firearm directly to CI-1. At this time, CI-1 was still waiting at Makin Road for JAMES to arrive and sell CI-1 a firearm that they had previously discussed. On the call with CI-1, JAMES indicated that he might want to sell the gun to someone else who would pay more for it since CI-1 purchased RIVERA's firearm directly from RIVERA, as opposed to through JAMES, as initially negotiated, and now JAMES would not be making money off of that sale. CI-1 then agreed to pay a higher price that matched the other offer, and JAMES sold CI-1 the gun.

21.     During the August 23, 2018 firearm transaction, MURPHY facilitated the sale of four firearms to CI-1 on behalf of three other persons, one of whom lives at **Target Location H**. CI-1 was concerned about buying guns from persons other than JAMES, and contacted JAMES to ask about the deal. JAMES said, "if you on the block, you good," and "if KD doing the shit, KD already known, if KD do anything, KD already know it's gonna be all bad." I know "KD" is the street moniker for MURPHY. I believe that in these statements, JAMES was assuring CI-1 that CI-1 was safe doing a gun deal on Makin Road ("if you on the block, you good") because JAMES controlled that area, and that MURPHY, specifically, would not double-cross CI-1 because MURPHY would have to answer to JAMES if he did ("if KD do anything, KD already know it's gonna be all bad").

22.     Similarly, on October 9, 2018, JAMES not only sold a gun himself, but also facilitated WASHINGTON's sale of a gun to CI-1. During the deal, JAMES told CI-1 that WASHINGTON had "a 9 Genesis too but he gotta go get it." WASHINGTON then left and returned with a 9mm pistol, which he sold to CI-1.

23.     In each of these deals, I believe that JAMES exercised some kind of control over the deal and the players, and as he indicated on June 18, that he receives a commission on the guns that his associates sell through him on Makin Road.

24.     I believe that Marvin Cooper supplied the AR-15 style assault pistols that JAMES sold to CI-1 on October 11, 2017 and October 24, 2017. On October 11, 2017, CI-1 made contact with JAMES at approximately 12:00 p.m., at which time, JAMES said that he had a

"choppa" that he could sell CI-1. The term "choppa" is common street vernacular for AR- and AK-type firearms. JAMES told CI-1 that he was going to call his "boy" regarding the firearm. Phone records show that JAMES then used his cell phone to call a number ending in -8612 three times between approximately 12:12 and 12:14 p.m. At approximately 12:27 p.m., JAMES received a return call from that number. JAMES told the caller that he was on his way. JAMES then told CI-1 he had to go to High Street to pick up the assault rifle and would call CI-1 once he had it. Cooper's residence, **Target Location N**, is off of High Street in Oakland. Cooper is the subscriber for the utilities at **Target Location N**. JAMES returned to Makin Road less than an hour later and had the AR-15 pistol with him in the backseat of his car, **Target Vehicle 1**.

25.     During the October 24, 2017 deal, JAMES again called Cooper's -8612 number prior to the sale. In this conversation, JAMES said, "tell Yolanda to bring it . . . Yolanda got the case over there . . . tell her to bring it to you then uh have Yolanda swing it this way." I believe that JAMES was speaking with Cooper and telling him that Yolanda Rivera would bring Cooper money for the firearm and then she would get the firearm from Cooper and bring it to JAMES on Makin Road to sell to CI-1. A short time later, JAMES received a call from a number ending -9804, subscribed to Yolanda. JAMES told the caller, "he gon give that to you then bring it to me . . . give him $1,100." I believe JAMES was telling Yolanda to bring Cooper the money for the gun and then deliver it to JAMES on Makin Road. Shortly thereafter, agents saw a woman, later identified as Yolanda, arrive on Makin Road. JAMES retrieved an AR-15 style pistol from the back seat of her car and sold it to CI-1. Yolanda's residence, **Target Location E**, is in the same building as Cooper's, **Target Location N**.

26.     The gun Yolanda brought to JAMES on October 24, 2017 was similar in appearance to the one JAMES sold to CI-1 on October 17, 2017: both appeared to be made from unfinished lower receivers, and neither had normal firearm markings, like manufacturer name, model designation or serial number.

27.     Finally, during a firearm transaction on January 31, 2018, when CI-1 was looking for an AR-15 style pistol, JAMES placed a phone call to the -8612 number in CI-1's presence

and said "Marvin, your boy don't know uh anybody that got any of those things right now...call him." I believe the "Marvin" to whom JAMES spoke was Marvin Cooper.

28. I believe that STERLING supplied the AR-15 style pistols JAMES sold to CI-1 on November 21, 2017 and June 5, 2018. STERLING delivered the gun to JAMES on Makin Road on November 21, 2017, and JAMES said that "Dot" was the person supplying it. I know that "Dot" is STERLING's street moniker,[4] and "Dot" arrived in a car registered to STERLING. On June 5, 2018, STERLING came to the 200 block of Makin Road and sold CI-1 an AR-15 firearm directly. STERLING told CI-1 that he and his associates had additional AR-15 style pistols and that he could acquire fully automatic firearms for CI-1 as well. When CI-1 asked about future firearms sales, STERLING just said, "Unk will let you know." I know that "Unk," short for "uncle," is a common term used to refer to JAMES.

29. JAMES also appears to direct the day-to-day drug sales on the 200 block of Makin Road. Images from a pole camera with a view of Makin Road show what appear to be hand-to-hand transactions all day long, every day. Video from CI-1's body-worn camera during CI-1's visits to Makin Road confirm that these are drug transactions. As stated above, it appears that the dealers operate in shifts, just like workers in any retail operation. Based on pole camera observations and evidence obtained from informants' body-worn cameras, observations during an enforcement action on December 12, 2018, and wire intercepts it appears that RIVERA, MOORE-WILLIAMS, and others work the day shift, from approximately 10:00 a.m. until about 5:00 p.m. WASHINGTON, KENNEDY-PALMER, and others work the night shift, from approximately 5:00 p.m. until the early morning hours.

30. Text messages found in a phone Oakland police officers seized from RIVERA on June 28, 2018 show JAMES keeping track of RIVERA's and WASHINGTON's drug sales.

---

[4] Officers from the Oakland Police Department ("OPD") arrested RIVERA on June 28, 2018 following a hit-and-run accident. At the time, RIVERA had two cell phones in his possession. The officers seized the phones. Agents obtained a federal search warrant for one of those phones and searched it pursuant to that warrant. One of the contacts saved in RIVERA's phone was "Dot," and it was the number JAMES called on June 5, 2018 before STERLING arrived with the AR-15 pistol he sold to CI-1.

Thus, JAMES sent RIVERA a text message on February 27, 2018 that said, "Nef text me when you get t0 500". A short while later, RIVERA texted JAMES "It's 500". On March 3, 2018, similarly, JAMES sent RIVERA a message at approximately 2:22 p.m. that said "Hit me when you get to 500". At approximately 3:22 p.m., RIVERA text JAMES, "500" and JAMES responded, "Hit me when you get to 200". At approximately 4:11 p.m., RIVERA texted JAMES, "200" and JAMES responded, "Ok". At approximately 4:30 p.m., RIVERA texted JAMES, "gone" and JAMES replied, "9 min". I believe that this pattern indicates that JAMES was relying on RIVERA to keep track of the drug sales and to let JAMES know when the supply was dwindling, so that JAMES could time his trip to Makin Road to re-supply them. I believe the requests for updates when the count was at "500," and "200" indicate quantities of drugs, and that when RIVERA texted "gone," he was indicating that they were sold out. I believe that JAMES's response, "9 min," indicates that he was about 9 minutes away and was bringing the re-supply. On March 7, 2018, at approximately 3:11 p.m., JAMES again texted "Hit me when you get to 500" and RIVERA replied, "it's 800". JAMES then texted, "U got any balls left some body want one". RIVERA replied, "Yeah" and JAMES advised, "Ok he on his way". Based on my training and experience, I believe that the term "balls" refers to "8-balls" which is common street slang for approximately 1/8 ounce or 3.5 grams of drugs.

31.     Agents intercepted communications between RIVERA and JAMES while monitoring JAMES's cell phone communications pursuant to a federal wiretap. These communications showed the same pattern. For example, on November 14, 2018 at 3:13 p.m., RIVERA texted JAMES, "500". JAMES responded "Ok". The next day, again at 3:13 p.m., RIVERA sent the same message and JAMES sent the same response. The next day they spoke by phone at 3:10 p.m. JAMES asked how it was "looking," and RIVERA said it was "cool," that it was "damn near 5 right now." RIVERA asked JAMES to bring a half ounce, and JAMES told RIVERA to "hit" JAMES when RIVERA got to "2." At 4:46 p.m., RIVERA texted JAMES "200", and JAMES responded "Ok". The next day, November 17, 2018, at 3:13 p.m., RIVERA texted JAMES "500" and JAMES responded "Ok". On November 19, 2018, at 3:48 p.m.,

RIVERA asked "Could you bring me 300 out", and JAMES responded "Ok". Less than 20 minutes later, RIVERA texted "500".

32.     On November 15, 2018, RIVERA texted JAMES, "Bang said could u bring a half". JAMES responded "Ok" and "Tell him its 400 even". I believe that in these messages, RIVERA was ordering a half ounce of cocaine base from JAMES on MOORE-WILLIAMS's ("Bang") behalf.[5] JAMES agree to bring it, and said it would cost $400. On November 19, 2018, MOORE-WILLIAMS used RIVERA's phone to call JAMES. During the call, MOORE-WILLIAMS identified himself (as "Bang") and asked JAMES to bring a "half and a 8-ball." JAMES said "yeah I got you." I believe these communications indicate that MOORE-WILLIAMS is part of the day shift and works with RIVERA selling drugs for JAMES.

33.     Text messages recovered from one of RIVERA's phones and wire intercepts similarly confirm that WASHINGTON works for JAMES. For example, on May 19, 2018, at approximately 4:06 p.m., JAMES texted RIVERA, "Give June the work at 5 text me what you give him". I believe JAMES was instructing RIVERA to hand over the drugs ("the work") remaining at 5:00 p.m. to WASHINGTON ("June"), who was working the next shift, and that RIVERA should let JAMES know how much he had given "June," so that JAMES would know what "June" was starting with.[6] At approximately 4:27 p.m., JAMES told RIVERA to "Count the change you got right now". RIVERA responded, "480". I believe that, just as cashiers count the money in the register when they start and when they finish a shift, JAMES was directing RIVERA to tell him how much money RIVERA was turning over to WASHINGTON so that

---

[5]     I believe that MOORE-WILLIAMS is "Banger" because Oakland police had contacted MOORE-WILLIAMS in that same Ford Mustang from which MOORE-WILLIAMS sold CI-1 a gun on January 31, 2018. During that transaction, JAMES referred to MOORE-WILLIAMS as "Bang." I compared a DMV photo of MOORE-WILLIAMS to the person depicted in the footage from CI-1's body worn camera in that transaction and confirmed it is the same person. CI-1 also looked at the DMV photo and confirmed that CI-1 knows person in it as "Banger."
[6]     I believe that WASHINGTON's moniker is "June" because WASHINGTON's Instagram profile name is "bankrolljune." RIVERA had a telephone number ending in -7466 saved in his phone as "bankroll," and when someone sent RIVERA asking for "June's" phone number, he sent the number associated with "bankroll" in his phone. Agents intercepted the -7466 number in the communications with JAMES related to drug sales on Makin Road described herein.

JAMES would know how much WASHINGTON was starting with for the next shift. Similarly, on June 23, 2018, at approximately 4:15 p.m., JAMES sent RIVERA the following: "Hit me when u get to 400 give the work to june at 5 text me what u give him."

34.    Communications intercepted during the federal wiretap of JAMES's phones showed the same pattern. For example, on November 20, 2018, JAMES texted RIVERA at 4:12 p.m., "At 5 give june the you hold the change". At 5:24 p.m., JAMES texted WASHINGTON, "How much work did paul give u". WASHINGTON responded, "I dnt knw didn't count it but I ain't takin no shirts" "Shorts". I believe WASHINGTON was saying that, although he had not counted what RIVERA turned over to him, he was not going to accept responsibility for any missing money or drugs. JAMES then called at 6:17 p.m. and asked WASHINGTON to "do the count." Two minutes later, WASHINGTON texted "8 big 23 small". On November 24, 2018, JAMES texted WASHINGTON at 5:48 p.m. "U coming out tonight" and WASHINGTON responded "Yep almost there". On November 27, 2018, at 8:17 p.m., WASHINGTON texted JAMES "300" and JAMES responded "Ok" and "Hit me at a 100 Nef". WASHINGTON responded "Ok". On November 29, 2018, JAMES called WASHINGTON at 8:43 p.m. and asked if WASHINGTON had enough to last until 9:30. WASHINGTON said he did. JAMES said he would be there between 9 and 10. On December 4, 2018, at 6:56 p.m., JAMES texted WASHINGTON "Hit me at 250". WASHINGTON said "Ok".

35.    The Oakland Police Department ("OPD") arrested KENNEDY-PALMER on Makin Road at about 7:00 a.m. on October 7, 2018. At the time, KENNEDY-PALMER was in possession of 68 individually-wrapped bindles of suspected cocaine base. Police also found a total of approximately $591 in cash in his pants pocket and inside a bag recovered from his car. I believe that KENNEDY-PALMER is one of JAMES's dealers. RIVERA had a contact saved in his phone as "Taedo," and that number had contacts with one of JAMES's phones. I know that KENNEDY-PALMER's moniker is "Taedo" because I have seen two social media posts with that moniker and pictures of him. Further, after OPD arrested KENNEDY-PALMER, he made several phone calls from jail. During one of those calls, he spoke to a person identified as "Dot."

I believe this was STERLING. In another call, the person told KENNEDY-PALMER that everybody was asking where the "dark" was. I know that terms like "black" and "dark" are slang words for heroin. KENNEDY-PALMER said it was "around the corner." I believe this meant that KENNEDY-PALMER had stashed the drugs somewhere close by in the neighborhood, which is consistent with how JAMES's workers operate when they are selling drugs in that area.

36. On December 12, 2018, OPD, in coordination with ATF, conducted an enforcement operation on Makin Road. At approximately 12:30 p.m., agents and officers arrived at the 200 block of Makin Road. There, they found RIVERA in the front seat of **Target Vehicle 11**. A San Leandro Police Department officer used his detection canine to sniff cars parked along the street, as well as the fence bordering the sidewalk in front of **Target Location H**. The canine alerted on a green Lexus parked on the street. The car had an expired registration, was unlocked, and had cobwebs in the wheel wells. It appeared as though it had not been operated in a long time. Officers elected to tow the car. Prior to towing the car, they conducted an inventory search and recovered a Glock-type .40-caliber pistol equipped with a "Glock auto switch," allowing the user to switch between semi-automatic and fully automatic fire, and a Ruger LCP .380 caliber pistol. They also found two balloons that appeared to be filled with an unknown liquid. Upon touching the balloons, officers could feel what they believed to be individually wrapped bindles of drugs. I know that it is common for drugs to be concealed in liquid in order to mask the smell from detection dogs.

37. The canine also alerted on two lockboxes attached to the fence bordering the sidewalk in the vicinity of **Target Location H**, as well as a chair on the sidewalk in front of **Target Location H**, no more than six feet from where RIVERA sat in **Target Vehicle 11**. Agents and officers contacted the residents at **Target Location H** and asked if the locks and chair belonged to them. A woman inside **Target Location H** said that the chair and the lockboxes attached to the fence did not belong to anyone at **Target Location H**. Agents and officers also attempted to contact the residents of neighboring home 216 Makin Road, but the

front gate was locked and they were unable to access the front door. Neither RIVERA nor anyone else on Makin Road claimed ownership of the two lockboxes. Underneath the chair, which was located on a public sidewalk, agents and officers found and recovered a black Master Lock key hide which was attached by a magnet to the bottom of the seat. Upon opening the key hide, agents and officers recovered approximately sixteen individually-wrapped bindles containing small, off-white rocks consistent in appearance with cocaine base. Inside one of the two lockboxes, agents found approximately thirty-seven rocks of suspected cocaine base packaged identically to the previous key hide. The second lockbox contained one larger clear plastic baggie containing approximately seventy rocks of suspected cocaine base packaged just like the ones in the other lockbox and key hide. Officers also found a digital scale inside a concrete utility box buried in the grass next to RIVERA's **Target Vehicle 11**. Agents and officers continued to search the area near the two key locks attached to the fence. In the adjacent yard of 216 Makin Road, no more than 2 or 3 inches from where the key locks had been attached, agents observed a plastic cylinder lying on the grass within arm's reach of the sidewalk. Officers recovered the cylinder, opened it and observed approximately seven small plastic twists containing a black, tar-like substance that smelled strongly of vinegar. Based on my training and experience, I believe this to be heroin.

38.     During the searches described above, JAMES received multiple phone calls in which people gave him updates on what the police were doing. One call came from a phone number (ending -9486), which I believe belongs to RIVERA's girlfriend. The caller told JAMES that law enforcement had stopped and searched RIVERA. Terry WALKER called JAMES and asked if JAMES had heard about what was going on. WALKER told JAMES, "They got the dogs too," which I believe was a reference to the detection canine. A woman who I know resides at **Target Location H** also called JAMES and told him "they" were at Makin with dogs and "hella shit." She spoke to JAMES again later. In that call, JAMES asked "Did they open them locks on that gate?" and the woman responded, "I think so." JAMES then asked if the "seat" was still in front of **Target Location H**. She said it was not. She told JAMES,

18

"They tearing that shit apart right there by my house," and, "They cut the lock off." JAMES replied, "Damn." Another person called and told JAMES that the police were searching a "red" car. JAMES said there was nothing in that car. RIVERA's girlfriend called JAMES again, and told JAMES that the police had found a key lock under the chair. "Yeah the key lock under the chair was dope," JAMES said. "Did they get the lock off the gate too?" he asked. She replied, "They cutting that right now." JAMES replied, "It's dope in there too." I believe these calls, and particularly JAMES's statements showing that he knew where the drugs were hidden, reflect his involvement in the drug sales taking place on the block.

39. The early afternoon search did nothing to dissuade JAMES or his evening shift from resuming drug sales, however. That afternoon, WASHINGTON called JAMES and asked what happened over "there." JAMES said the police "hit." WASHINGTON then said that people called him saying "don't go outside they got pictures and dogs." I understood this to mean that someone had warned WASHINGTON not to go to the 200 block of Makin Road. Nonetheless, phone conversations between WASHINGTON and JAMES intercepted later that evening indicated that WASHINGTON did show up for his shift and most likely resumed selling drugs. At 4:58 p.m., JAMES called WASHINGTON and told WASHINGTON to let him (JAMES) know when WASHINGTON got to "three." At 5:37 p.m., WASHINGTON texted "30" and JAMES responded "Ok". They spoke on the phone at 6:02 p.m. In that call, JAMES asked how many WASHINGTON had left. WASHINGTON said he had "15" or so. JAMES said he would come to the block.

## C. Moore and WALKER Work Together to Supply Drugs to JAMES.

40. As mentioned above, WALKER called JAMES on December 12, 2018 to notify him of the law enforcement activity on Makin Road. WALKER also called George Moore to notify Moore about the activity. I believe this is because both men work together to supply the drugs that JAMES sells.[7]

---

[7] Moore has two prior felony convictions: one from November 17, 1983, for violation of California Health & Safety Code ("H&S") § 11351 (possession of a controlled substance for

41.     For example, on November 2, 2017, JAMES sold CI-1 about an ounce of cocaine base and a half-ounce of powder cocaine. During that deal, CI-1 said to JAMES, "aye my OG from the hood like yo stuff, he wanna know if he can get it bagged up." I know that this was a request for drugs. JAMES asked, "rocked up?" which meant did CI-1 want the cocaine as powder or cocaine base ("rocked up"). CI-1 asked for both cocaine base and powder cocaine ("soft"). JAMES said "alright ima call." He then called WALKER. After the call ended, JAMES said "He on his way over here right now with the soft." I believe that JAMES meant that his contact was coming with powder cocaine. A little while later, WALKER's car, **Target Vehicle 3**, arrived at 211 Makin Road, **Target Location G**. JAMES met with the driver, then returned to CI-1 and said "I just got the hard – that's the hard, that's the soft." JAMES handed CI-1 an ounce of cocaine base and a half-ounce of powder cocaine.

42.     On March 8, 2018, similarly, CI-1 asked for a gun and some "powder." JAMES responded, "you want just one hard and one soft or what? How you want it?" I believe JAMES was asking whether CI-1 wanted an ounce of cocaine base ("one hard") and an ounce of cocaine powder ("one soft"). CI-1 said, "let me get one soft, one hard," meaning an ounce each of cocaine base and cocaine powder. Immediately following that conversation, JAMES called WALKER. A short while later, WALKER's car, **Target Vehicle 3**, arrived at 211 Makin Road, **Target Location G**, and parked in the driveway. JAMES then arrived on Makin Road, went to WALKER's car, then met with CI-1 and gave CI-1 an ounce each of suspected cocaine powder and suspected cocaine base. Agents followed WALKER after he left Makin Road. He drove directly to his residence, **Target Location C**.

43.     On June 5, 2018, CI-1 purchased a gun and drugs from JAMES. During the deal, CI-1 asked if JAMES had any "soft." JAMES said, "Yeah I got it, what you want?" and CI-1

sale); and one from December 10, 1982, for violation of H&S § 11350 (possession of a controlled substance). Moore's son is currently serving a nine-year federal prison term for possession of cocaine and cocaine base for sale. WALKER has six prior felony convictions: Oct. 6, 1999 and May 10, 1993, for violation of Cal. H&S § 11350 (possession of a controlled substance); Nov. 15, 1982 for violation of Cal. H&S § 11352 (transport/sale of a controlled substance); and three convictions from the mid-1970s for battery, burglary and grand theft.

asked for one or two ounces. CI-1 asked, "You got it on you or you gotta wait?" and JAMES replied, "Either way it go you got to wait. It ain't gon' take that long though. Let me call." I believe that JAMES meant that whether CI-1 wanted one or two ounces, CI-1 was going to have to wait for someone to bring it to JAMES, but that it would not take long. JAMES walked away to make the call. Toll records indicated that JAMES called WALKER on a phone number ending in -1087. GPS location data indicate that WALKER's phone was in the vicinity of the Wendy's located at 189 98th Avenue, about a half mile from where CI-1 and JAMES were meeting. JAMES returned to CI-1 and said that the cocaine was on its way. JAMES instructed CI-1 to provide him with the money so JAMES could "just grab" the cocaine from "him." CI-1 gave JAMES the money for the drugs. A short time later, WALKER's car, **Target Vehicle 3**, arrived at 211 Makin Road, **Target Location G**, and parked in the driveway. JAMES met with the driver for a moment, then returned to CI-1 and gave CI-1 approximately two ounces of suspected powder cocaine. GPS location data for WALKER's telephones revealed that he was located on the 200 block of Makin Road at or around that time. CI-1 identified WALKER from a DMV photo as the person who arrived in WALKER's car.

44.     Based on recorded calls, observations, and phone records, I believe that Moore supplied a half-kilogram of powder cocaine to JAMES on each of two occasions, and that WALKER acted as Moore's courier on the second occasion. During the deal on March 8, 2018, CI-1 told JAMES, "One of my n***** down in Stockton, my old homie, this n**** tryin to see how much is a half cost?" I believe that CI-1 meant that CI-1 had a friend in Stockton who wanted to know how much a "half" a unit of cocaine would cost. JAMES asked, "A half a key?" I believe that when JAMES said "half a key," he meant one half of a kilogram of cocaine. CI-1 responded, "Yeah, cuz he wants to cook it himself." I believe that CI-1 meant that CI-1's supposed friend wanted to convert powder cocaine into cocaine base ("cook it himself"). JAMES said, "Like 14...I can probably get it for like 13-750." I believe that JAMES meant that he could sell CI-1 a half-kilogram of cocaine for $14,000, but that he would try to get it as low as $13,750. JAMES then advised, "You might as well tell them let me know." CI-1 then asked,

"How much is your whole?" and JAMES replied, "A key is 36." JAMES also said that "[a] key is 2.2 pounds" and that, "You gon' love this too." I believe JAMES meant that a full kilogram would cost $36,000. CI-1 told JAMES the cocaine was for one of CI-1's "boys."

45.     In phone calls on March 13 and 14, 2018, CI-1 confirmed an order for one half-kilogram of powder cocaine. At the end of a call on March 14, JAMES told CI-1 to contact him the next day for the meeting location and said, "I'm 'bout to actually put it together right now, so I'm 'bout to grab it right now so I'll have it." I believe JAMES meant that he was about to pick up the half-kilogram soon after the phone call ("I'm 'bout to grab it right now"). This call was at approximately 4:23 p.m. Phone records show that JAMES called one of Moore's phones three minutes later. The call lasted 21 seconds. Ten minutes later, JAMES called CI-1. CI-1 didn't answer but called back. During that call, JAMES said, "Tomorrow, I just want to deal with you. . . . I don't want to fuck with them you feel me . . . I want to deal with you." I believe that JAMES meant that he did not want CI-1's supposed buyer to be present at the cocaine deal, that he only wanted CI-1 to be present.

46.     The next day, CI-1 called JAMES and said that he/she was 30 to 40 minutes from Oakland. JAMES said, "I should have it at the same time . . . Ima call him. Long story short, it'll be good. So just get out this way and call me." I believe that JAMES meant that he was about to call his source of supply for the cocaine and that he was confident that his source would be able to provide the cocaine. Phone records show that, immediately following the conversation with CI-1, JAMES called one of Moore's phones. That call lasted approximately 50 seconds. Phone company records indicate that Moore's phone was using a cell tower about 122 meters from Moore's residence, **Target Location B**, at the time of the call. CI-1 and JAMES spoke again at about 3:06 p.m. In that call, JAMES said, "I'm actually waiting on ol' boy right now. He dropping it off to me right now. . . . Ima call him right now and see exactly where he at and Ima be over there." I believe that JAMES meant that he was waiting for his source of supply to drop off the cocaine to him and that he was about to call his source to find out exactly where the source was and when the source would drop off the drugs to JAMES. Phone records indicate

that JAMES called one of Moore's phones immediately after his conversation with CI-1. Surveillance units saw JAMES standing around the entry to his residence, **Target Location A**, at about 3:30 p.m. At about 3:31 p.m., JAMES got a call from one of Moore's phones. JAMES then walked away from his residence. He got two more calls from Moore's phones at 3:37 and 3:41 p.m. Phone company records show that Moore's phone was using a cell tower about a half-mile from JAMES's residence when it placed those calls. At about 3:42 p.m., surveillance units saw JAMES return to **Target Location A** carrying a white bag. JAMES then drove to meet with CI-1 and gave CI-1 approximately a half-kilogram of powder cocaine. It was concealed in a white bag similar to the one agents saw JAMES carrying when he returned to his residence.

47.    CI-1 purchased another half-kilogram of powder cocaine from JAMES on October 11, 2018. This time, I believe that WALKER acted as Moore's courier and delivered the cocaine to JAMES prior to the sale. CI-1 contacted JAMES on October 7, 2018 to request another half-kilogram of cocaine. JAMES initially agreed to do the deal. The next morning, JAMES got a call from one of Moore's phones. A half-hour later, JAMES sent a text message asking CI-1 to call him. During the call, JAMES said, "It's bad on that work, blood." JAMES said, "I ain't gon' lie that shit makes me kinda nervous blood. I ain't gon' even fuckin lie. Especially with the other shit that we goin' through." I believe JAMES meant he was unwilling or unable to sell CI-1 the half-kilo because he was nervous about a recent law enforcement action in the neighborhood. The day before, OPD had arrested KENNEDY-PALMER in the 200 block of Makin Road. At the time of his arrest, KENNEDY-PALMER had 68 individually-wrapped rocks of suspected cocaine base, a loaded pistol, about $500, and two digital scales.

48.    CI-1 called JAMES on October 10, 2018 at about 5:14 p.m. to see if they could do the deal the following day. JAMES said, "Alright, it's good. Let me make a phone call. I'll call you right back." Phone records show that JAMES called Moore at 5:15 p.m. The call lasted 43 seconds. JAMES then called CI-1 back. They spoke a few minutes later and JAMES said, "It's good for tomorrow" and that it would be "the same as last."

49.    The next morning, agents watched Moore as he drove from his residence, **Target**

23

**Location B**, to the parking lot at **Target Location L**. Moore parked and opened his trunk, and then called WALKER. WALKER arrived about 5 minutes later, met with Moore, then drove away. CI-1 and JAMES met on Makin Road about two hours later and JAMES gave CI-1 the half-kilogram of suspected powder cocaine. After CI-1 left, JAMES contacted WALKER by phone. A few minutes after that call, CI-1 called JAMES and said that CI-1's "homies" had thrown in some "extra for appreciation." This was meant to tell JAMES that CI-1 had given JAMES additional money for setting up the narcotics transaction.[8] JAMES replied, "Aww shit, I just gave it to the line" and "I just gave it to dude, I didn't count it again." JAMES asked CI-1 how much extra there was and CI-1 stated "a band." I know that a "band" is common slang for $1,000. JAMES then stated, "Aww fuck that, blood. I gotta call dude," and "I'm gonna call him right now." JAMES then called Moore. Moore then called WALKER. I believe this series of meetings and calls indicates that Moore supplied the cocaine that JAMES sold to CI-1, and had WALKER deliver it to JAMES on the morning of the deal. I further believe that JAMES gave CI-1's money to WALKER after the deal, and when JAMES found out that the money included extra for JAMES, JAMES called Moore to let Moore know that he (JAMES) needed to get some of the money back. I believe that Moore then called WALKER to let WALKER know about JAMES's request.

50.     As described below, Moore was intercepted during a federal wiretap having numerous conversations with suspected suppliers, customers, and associates, including JAMES and WALKER.

    **D.     Additional Information Regarding Search Locations**

        **1.     Target Location A**

51.     This is JAMES's residence. Agents have observed JAMES at that address on many occasions, and according to the utility company, JAMES is the customer for the utilities at this address. In addition, GPS location data for the phones JAMES used to talk to CI-1 and

---

[8]     Agents had inadvertently given CI-1 $16,000 instead of $15,000 to purchase the cocaine, and CI-1 had given that money to JAMES.

which were intercepted during the federal wiretap indicate that those phones were in the area of JAMES's residence in the late night and early morning hours, up until December 22, 2018, when the pings on those phones expired.

### 2. Target Location B

52. This is Moore's residence. According to the California Department of Motor Vehicles, MOORE resides at this address and agents have observed Moore there on many occasions. In addition, GPS location data for phones belonging to MOORE (including one intercepted during the course of a federal wiretap) indicate that those phones were often in the area of MOORE's residence in the late night and early morning hours up until December 22, 2018, when the pings on his phones expired.

### 3. Target Location C

53. This is WALKER's residence. PG&E records indicate that the utilities at this address are in WALKER's name, with his phone number as the contact number. In addition, GPS location data for phones belonging to WALKER, including one intercepted during the course of a federal wiretap, show that they were often in the area of this address in the late night and early morning hours up until December 22, 2018, when the pings on those phones expired.

### 4. Target Location D

54. I believe this is where RIVERA resides. According to a law enforcement database, RIVERA's girlfriend also resides at this address. GPS location data for RIVERA's phone, including one intercepted during the course of a federal wiretap, show that the phone was in the area of **Target Location D** in the late night and early morning hours up until December 22, 2018, when the ping on his phone expired. On approximately two occasions, agents have observed RIVERA come from the apartments located at **Target Location D** and have observed his vehicle parked in the gated entrance to this complex. Further, when OPD arrested RIVERA on December 12, 2018, JAMES had multiple conversations with RIVERA's girlfriend. During one call, JAMES told her to make sure there was nothing in the house. I believe JAMES gave her this instruction because he wanted to ensure that, if the police knew where RIVERA lived

and searched his residence, they would not find anything incriminating.

### 5. Target Location E

55.   I believe that this is Yolanda's residence. The car that Yolanda drove to drop off the AR-15 pistol to JAMES on October 24, 2017 was registered to her at this address. Agents observed Yolanda return to and enter this location after the deal. In addition, DMV records list this location as her address. Lastly, on December 21, 2018, a surveillance unit observed Yolanda at this location.

56.   I believe Yolanda's residence is likely to contain contraband, drug proceeds, and/or items used to facilitate JAMES's drug and gun distribution. First, based on JAMES's end of the conversation on October 24, 2017, Yolanda already had in her possession the cash JAMES paid to the person who supplied the AR-15 pistol. This indicates that JAMES stores money with her. Second, on November 29, 2018, agents intercepted a call between JAMES and Yolanda in which JAMES asked her if he left the "work" up there. I know that JAMES uses the term "work" to refer to the drugs he sells. Yolanda said it was, that it was on the table. JAMES asked if there were "400" and the "5 solids." Yolanda said there were. I believe that in this call, JAMES was asking about drugs that he had stored at Yolanda's residence, or which someone had dropped off for him there.

### 6. Target Locations F and I

57.   I believe that **Target Locations F and I** are places Moore uses to facilitate his drug trafficking operation. I believe that Moore stores drugs at the Legends Barbershop, **Target Location I**, and converts powder cocaine into cocaine base and/or packages larger quantities of cocaine base into smaller quantities for individual sales at **Target Location F**. **Target Location F** is the residence of one of Moore's co-conspirators, D.D. The utilities at that address are subscribed in D.D.'s name, and D.D. is one of Moore's frequent callers.[9]

---

[9]   D.D. has two prior convictions, at least one of which was a drug offense: May 4, 1987 for violation of Cal. H&S § 11350(a) (possession of a controlled substance), and one from August 27, 1991 for violation of Cal. Penal Code ("PC") § 32 (accessory)

58.     GPS location data, physical surveillance, and pole camera observations establish that Moore follows the same pattern of travel on most days, including as recently as the third week of December, 2018.  He leaves home and goes to the barber shop, **Target Location I**, arriving early in the morning, sometimes before it opens (according to an internet search of its operating hours).  He stays there only a short time – between 5 and 10 minutes – then drives to 275 Lee Street, **Target Location F**, where he remains for an hour to an hour and a half.  From **Target Location F**, Moore typically goes to meet the people he supplies, including JAMES.

59.     I know from my training and experience and conversations with other agents involved in this investigation that it is common for higher-level traffickers to use their close associates' and family members' residences to store and process drugs.  This helps insulate the traffickers from culpability if the police search that location and find drugs, and helps ensure that the police will not find drugs if they search the traffickers' residences.  It also helps conceal the locations where they store drugs from other traffickers, who may want to rob them.  I also know that the process of converting powder cocaine into cocaine base involves multiple steps, including cooking the powder cocaine with baking soda and then allowing it to cool, and takes time.  I also know that breaking a larger amount of drugs down into smaller quantities suitable for individual retail sales takes time.  The fact that Moore remains at **Target Location F** for such a long time is consistent with his performing either or both processes inside.

60.     In addition, Moore appears to take precautions to protect himself while he is at **Target Location F**.  Moore appears to park in D.D.'s resident parking spot behind the building.[10]  This helps hide Moore's car from public view and conceal the fact that he is there and the amount of time he is there.  Agents have also observed WALKER acting as what appears to be a lookout while Moore is inside.  For example, on May 2, 2018, agents saw Moore go to **Target Location I**, stay for about five minutes, then drive to **Target Location F**.  While at **Target Location I**, he met WALKER and WALKER went with him to **Target Location F**.

---

[10]     In two intercepted calls in November and December 2018, Moore and D.D. discussed Moore parking in D.D.'s space and/or D.D. moving his car to make room for Moore's car.

When Moore got to **Target Location F**, he pulled into the back parking lot. Agents were unable to see what Moore did, in part, because WALKER sat at the entrance of the driveway for approximately an hour. WALKER then abruptly stood up and jogged back down the driveway. Minutes later, Moore and WALKER drove out of the parking lot together. They drove to the area of the Grand-Lake Theater in Oakland, then returned to **Target Location F**, where they again drove down the driveway and out of sight. A half-hour later, they again drove out of the driveway together. Moore dropped WALKER off a few blocks away and then drove to JAMES's residence, **Target Location A**. While on the way, Moore made two very short phone calls to JAMES. Agents observed Moore arrive in the area of JAMES's residence.

61.     Moore does not appear to take any of these same precautions at his own residence, **Target Location B**. He parks his car in the driveway in plain sight, and he does not appear to have anyone posted outside watching for law enforcement or other traffickers who may want to rob him.

62.     Intercepted calls between D.D. and Moore corroborate D.D.'s involvement in Moore's operation. In a call on December 2, 2018, for example, Moore and D.D. discussed how much Moore had left D.D. and how much D.D. owed Moore. Moore asked what he gave D.D. the previous day and D.D. said he got "two." Moore clarified that it was "two halves" and D.D. agreed. Moore complained that D.D. didn't give Moore anything from what D.D. owed, and that D.D. had only given him what "Terry" owed. I believe "Terry" was Terry WALKER. D.D. disagreed and said he gave Moore "three-quarter" money, "1200 dollars." During the call, D.D. referred to Moore being in the "kitchen" while Moore was at D.D.'s residence. I believe that this exchange represents Moore and D.D. keeping track of how much cocaine or cocaine base Moore gave to D.D., and how much money D.D. owed to Moore for it. I further believe that D.D.'s reference to Moore being in the "kitchen" was a reference to Moore either cooking cocaine into cocaine base or breaking down larger amounts into smaller amounts.

63.     I believe that Moore stashes his drugs at **Target Location I**. His visits frequent and short – too frequent and short for a haircut or shave. Further, in intercepted phone calls,

Moore told some of his customers that he was going to see "him," and would let them know what time he was going to get his hair cut. I believe this was a reference to meeting his source and picking up drugs, and then coordinating meetings or drop-offs at **Target Location I**.

64.     For example, intercepted communications suggested that Moore received cocaine from one of his sources on November 16, 2018. Following that meeting, Moore went to **Target Location I**. Not long after, Moore called JAMES and said that he needed to let JAMES' people look at the "thing" but that he knew it was "cool" because his "people already checked it." I believe this to mean that, while JAMES was entitled to inspect the drugs prior to accepting delivery, Moore's "people" had already looked at them and determined that they were high quality. In addition, on November 26, 2018, Moore spoke to a person I believe was a customer, and told that person that he was about to get his "haircut" and that the "thing" was already there.

### 7.     Target Location G

65.     **Target Location G** is associated with WALKER. Phone company records indicate that WALKER lists **Target Location G** as his address. It is also the address listed as his residence with the DMV. On the three occasions when WALKER delivered cocaine to JAMES on Makin Road, WALKER parked in the driveway of **Target Location G**. And GPS location data for WALKER's phone showed that WALKER was often in the area of **Target Location G** during the day up until December 22, 2018, when the pings on his phones expired. Agents and CI-1 have also observed JAMES and his drug dealers via pole camera and CI-1's body-worn camera regularly accessing **Target Location G** while they are selling drugs on Makin Road.

### 8.     Target Location H

66.     This address is associated with A.L. – PG&E records indicate that she is the subscriber for the utilities there. I believe that evidence related to the crimes listed above will be found at **Target Location H** because guns that CI-1 bought on June 28, 2018 and August 23, 2018 came out of **Target Location H**, as described above. Further, I believe that A.L. spoke to

JAMES repeatedly during the law enforcement action on December 12, 2018,[11] providing him with updates on what the agents were searching. When JAMES later accused A.L. of being the one who told law enforcement where to search, A.L. told him she would not do that because she had "hella shit" in her house. I believe this to mean that she would not cooperate with law enforcement because she had contraband in her own house and would not risk incriminating herself. The chair that contained the drugs seized that day were in front of **Target Location H**, and the lockboxes were attached to the fence around **Target Location H's** front yard.

### 9. Target Location J

67. I believe that this is the residence of one of Moore's sources of supply for cocaine, a person whose initials I believe are H.Z. On November 14, 2018, for example, agents monitoring Moore's cell phone communications intercepted a call in which H.Z. told Moore to check that "one" and see if he likes it because he has more of that "one." Moore, WALKER, and JAMES all exchanged calls that day discussing whether people liked the stuff. In a call at 4:28 p.m., WALKER told Moore that the "main broad" said that "the shit" made her stomach sick. WALKER further said that the woman stated that she "cooked it back" and it still did not work. At about 4:33 p.m., JAMES called Moore and said that an individual was throwing up because of what they believed to be an "after effect." Moore said that he had never seen that happen. JAMES also called RIVERA and asked if "April" had said whether she liked the "shit." RIVERA confirmed that she did not. JAMES then called Moore and relayed that his "nephew" said it made her "hella sick." I believe this refers to Moore getting a sample of drugs from his source and then giving it to others to try in order to check the quality of the drugs. The reports from those "testers" was that the drugs made them sick.

68. Throughout this period, Moore made multiple attempts to contact H.Z. When they finally spoke, Moore said "it's not cool" and that it was making everyone sick. H.Z. asked how much Moore had used and Moore said only three grams, and "it was still whole" and he

---

[11] The phone number was the same one listed in the PG&E records, and JAMES told others that he suspected her of being the one who provided information to law enforcement.

"didn't cut it open or nothing." H.Z. said that the other one was coming the next day, and offered to let Moore wait and exchange it. Moore agreed. Moore and H.Z. spoke again on November 16, 2018 and arranged to meet. On or about November 23, 2018, agents began receiving GPS location data for the phone that H.Z. used, as well as the phone H.Z.'s suspected courier, a person whose initials I believe are J.R., used. Those data indicate that both phones were in the area of **Target Location J** during the day and late at night. Further, each phone moved when surveillance units saw its suspected user (H.Z. or J.R.) leave the house. For example, on December 3, 2018, agents observed H.Z. leave **Target Location J** and get into **Target Vehicle 8**. Prior to his departure, location data indicated that his phone was in the area of **Target Location J**. At the next ping interval, his phone was in the area of International Boulevard and 88th Ave. in Oakland. The agent saw him return about 10 minutes later. At the next ping interval, his phone was back in the area of **Target Location J**.

69.     On November 28, 2018, Moore asked JAMES for "14-5," which I believe meant $14,500. Moore told JAMES that he was going to get "one" for JAMES and WALKER. Surveillance units following Moore that day observed Moore meet with JAMES and obtain what appeared to be a black plastic bag. Moore then contacted H.Z. and said he needed a "favor." He said he had most of it but might need two days before he could bring the rest. Moore said he had "like 20 or 21," which I believe meant that he had $20,000 or $21,000. H.Z. asked if Moore needed "two" and Moore responded, "one." I understood this conversation to reference the amount of drugs Moore was requesting and Moore informing H.Z. that he was short on cash and only had $20,000 or $21,000 ready. H.Z. called Moore back and said that it was "fine." They arranged a meeting later that same day. Agents surveilling **Target Location J** observed J.R. **Target Location J** with a bag in hand and meet with Moore. When he met with Moore, agents observed J.R. provide the bag to Moore in exchange for what appeared to be the bag that JAMES had provided to Moore earlier that day. J.R. then returned to **Target Location J**. I believe that what the agents observed was an exchange of drugs for money.

70.     GPS location data for the phone associated with Moore's H.Z. indicate that the

phone was in the area of **Target Location J** in the late night and early morning hours up until December 22, 2018, when the ping expired.

### 10. Target Location K

71.     I believe that C.S., a person I believe works with Moore to traffic heroin, resides at **Target Location K**. During the course of a federal wiretap, agents intercepted multiple conversations between Moore and C.S. in which they spoke about "black," which I know is a common slang word for heroin (because of the dark color of tar heroin), and "whit girl," which I believe is a reference to cocaine (because of its appearance). On November 19, 2018, for example, C.S. and Moore arranged for WALKER to give C.S.'s partner two "zips" of "black." I know that "zip" is a common slang word for an ounce of drugs. Thus, I believe that C.S. and Moore were arranging the distribution of two ounces of heroin. GPS location data for the phone C.S. used for those calls indicates that the phone consistently was in the area of **Target Location K** during the late night and early morning hours as recently as December 14, 2018.[12] In addition, on November 28, 2018, a surveillance team saw a person they believe was C.S. departing **Target Location K** in a Silver Lexus with paper plates. Later that day, surveillance units observed C.S. meet with Moore and engage in what appeared to be a hand-to-hand transaction. C.S. was in the same car.

### 11. Target Location L

72.     I believe that Moore uses **Target Location L** to store money and/or drugs. Moore's daughter, K.M., is the subscriber for the utilities at that location. Moore met WALKER in the parking lot at **Target Location L** just prior to the half-kilogram cocaine deal between CS-1 and JAMES on October 11, 2018. On November 30, 2018, agents intercepted a call in which one of Moore's suspected customers asked Moore how they were looking for the next day. Moore said he would get up in the morning and do it. Moore said "it" was "fantastic." I believe

---

[12]     After that date, it appears that this phone was no longer in service. I know that it is common for drug dealers to change phones to make it difficult for law enforcement to identify and locate them.

this was a reference to the quality of the drugs Moore had. The customer asked if they could do it that day. Moore declined, saying he had just taken off his clothes. GPS location data indicated that Moore's phone was in the area of his home, **Target Location B**, at the time. The customer asked if they could meet in the early morning. Moore agreed and said "it's out here so it won't be a problem." The next morning, Moore called the customer and asked if he needed "2 things or 1." The customer responded "just my regular thing." Moore said he was on his way. GPS location data for Moore's phones show that, prior to meeting the customer, he went to the area of **Target Location L**. Moore then went to the area of **Target Location Q**. I believe the calls and GPS data combined indicate that Moore went to **Target Location L** to pick up the drugs before going to deliver them to his customer at **Target Location Q**. Moore has repeated this same pattern of travel – going to **Target Location L** prior to going to the area of **Target Location Q** since December 1, 2018. As recently as December 20, 2018, he visited **Target Location L** and then went to **Target Location Q**.

### 12. Target Location M

73. STERLING resides at this address. GPS location for STERLING's phone indicates that his phone is in the area of **Target Location M** during the late night and early morning hours. On multiple occasions, surveillance units have observed STERLING's vehicle, **Target Vehicle 12** parked at **Target Location M**. On multiple occasions, surveillance units have also observed STERLING loitering and hanging around outside **Target Location M**. For example, on or about November 7, 2018, after GPS pings for STERLING's phone placed him at **Target Location M**, agents observed STERLING leave the apartment building and go into **Target Vehicle 12**. Agents saw him there again on December 19, 2018. GPS location data for STERLING's phone indicated that the phone was in the arear of **Target Location M** during the late night and early morning hours up until December 22, 2018, when the ping expired.

### 13. Target Location N

74. I believe that Marvin Cooper resides at **Target Location N** because, according to PG&E, the utilities there are in his name. On several occasions, surveillance units have observed

a vehicle registered to Cooper parked at **Target Location N**. In addition, after the enforcement action on December 12, 2018, JAMES called Cooper on the phone (the same -8612 number he called during the gun deals) and went to **Target Location N** to see him. Later that night, JAMES called Cooper on the phone and asked if he (JAMES) left any "work" there. Cooper said no, and "I cleaned up everything." I believe that in this call, JAMES was asking if he had left any drugs ("work") at Cooper's residence and Cooper said JAMES had not, that Cooper had cleaned everything up anyway. I believe this was part of JAMES's effort to ensure, in the wake of the searches and seizures of drugs, that his business was insulated from further law enforcement intervention.

### 14. Target Location O

75. I believe that G.C., someone who purchases cocaine from Moore, resides at this address. Based on communications heard over the federal wire intercept in this case, agents believe G.C. works with other individuals, namely J.F., to buy cocaine from Moore and then redistribute the cocaine to others. I believe that G.C. resides at **Target Location O** because G.C. is a registered sex offender and has provided **Target Location O** as his address.[13]

76. In an intercepted call between Moore and J.F. on December 4, 2018, Moore said that he was owed "72-50" and an additional "24-50." I understood this to mean $7,250, which is the approximate price of a quarter kilogram of cocaine, and an additional $2,450 for what I believe was previously fronted narcotics. Moore said that he was owed this money because one of J.F.'s couriers was previously "short" on paying Moore for the "last 9 pack" Moore had provided. I believe that "9-pack" is street slang for 9 ounces, or a quarter kilogram, of cocaine. Moore then said that even though he did not receive the full payment last time, he still gave J.F's

---

[13] G.C. has a prior federal felony conviction for violation of 21 U.S.C. § 841. On April 13, 2012, he was sentenced to 60 months in federal prison and five years of supervised release. He is currently on supervised release. J.F. has a February 1, 2013 conviction for violation of 18 U.S.C. § 924(c), for which he served 60 months in federal prison. He too is currently on federal supervised release.

courier the "thing" because he already had it on him that day.[14] I understood this to mean that though Moore was not paid in full the last time he met with J.F.'s courier, he still provided the quarter kilogram of cocaine to the courier because he already had it on his person. J.F. said his "boy" would meet Moore that day and provide him with the money owed. J.F. said his "boy" would be in a blue Prius or silver Mercedes. Agents observed G.C. meet with Moore that day. When G.C. arrived, he was driving a silver Mercedes. Prior to that meeting, Moore went to **Target Location F**.

### 15. Target Location P

77.     I believe this is a secondary address used by G.C. I believe that G.C. also resides at **Target Location P** because G.C. provided **Target Location P** as another one of his addresses when he registered as a sex offender. Moreover, on December 21, 2018, a surveillance unit observed G.C. at **Target Location P**. **Target Location P** is also the listed address on G.C's DMV records. Based on my training and experience, I know that drug traffickers and individuals engaged in criminal activity routinely use various locations as stash houses to conceal their illegal items.

### 16. Target Location Q

78.     I believe that another of Moore's customers, E.M.[15] resides at this address. In an intercepted call on November 25, 2018, in which Moore and E.M. arranged a meeting for the following day, Moore referred to him by his first name. On November 26, 2018, E.M. was observed meeting with Moore. E.M. arrived in **Target Vehicle 10**. That vehicle is registered in E.M.'s name at **Target Location Q**. Agents then followed E.M. back to **Target Location Q**.

---

[14]     This is most likely a reference to a meeting between Moore and J.F.'s courier on November 23, 2018. Prior to that meeting, J.F. had said his courier had "72-50" on her and would give it to Moore. Apparently, she did not provide him that entire amount.

[15]     Based on my review of an Alameda County criminal records system, it appears that E.M. has nine prior felony convictions for drug offenses, five of which were for violations of California Health & Safety Code § 11351.5, possession of cocaine base for sale. His drug history stretches from 1988 to his most recent conviction on July 10, 2015. All of his drug convictions resulted in state prison sentences. According to that records system, E.M. has a different address from **Target Location Q**.

The surveillance team positively identified E.M. from a booking photo. The GPS location data for the phone E.M. used to talk to Moore during intercepted communications was frequently at **Target Location Q** in the late night and early morning hours up until December 22, 2018, when the ping on that phone expired.

79. During the course of the wiretap, agents intercepted numerous calls between E.M. and Moore that appear to be related to drugs. For example, on November 21, 2018, Moore told E.M. that he would not be able to see "him" until on or about November 24, 2018. I understood this to mean that Moore was telling E.M. that he would not see his (Moore's) source until the following days. E.M. said he needed Moore to provide him with something a "little more solid," because "I've been having some serious complaints on that. . . . In fact, the guy from Sacramento didn't even take it." Moore asked if it was too "flaky" and E.M. replied, "too soft, too flaky, you know." Based on my training and experience, I believe that Moore and E.M. were discussing cocaine base. I know that cocaine base is typically hard, but depending on the quality of the cocaine used to make it and how it is "cooked," it can become flaky and, thus, less desirable to users and dealers. E.M. said that his guy in Sacramento had a "harder core crowd," but that he really needed the guy. Moore said, "I need him too. If you need him, I need him." I believe this was E.M.'s way of explaining why his customer in Sacramento might reject cocaine base that other dealers might accept – because the Sacramento dealer's customers were "hard core" addicts who wouldn't accept it. I further believe that when E.M. said he really needed the Sacramento guy, he meant that the Sacramento guy bought large quantities from E.M. and E.M. needed that income source. I believe that Moore's response – that he therefore also needed the Sacramento guy – reflected his understanding that he too stood to lose a large (or steady) source of income if E.M.'s customer started getting his drugs from someone else.

### 17. Target Location R

80. I believe that a woman, K.T., resides at this address, and that she is associated with Moore's nephew, J.F. (the same person referenced above), and acted has J.F.'s courier while the nephew was in a halfway house and unable to make the meetings with Moore himself.

Agents intercepted numerous phone calls between Moore and J.F., and Moore and K.T., discussing these meetings. For example, on November 15, 2018, Moore and K.T. spoke by phone and arranged to meet. During that call, K.T. said that they (K.T. and Moore) had been missing each other, but that she needed to give him the money. They ended up meeting on November 16, 2018 in the parking lot of the Bank of America in Oakland. K.T. drove a car registered to J.F. The surveillance team that observed the meeting identified K.T. from a DMV photograph.

81.    On November 23, 2018, J.F. and Moore spoke and J.F. said he would have "his girl" meet with Moore the next day with the "little rent money" that Moore let her borrow the previous week. J.F. said she had already made the rent money back. J.F. said that she would pay Moore the "72-50" that she owed Moore. I believe this was a reference to $7,250. J.F. then asked if they could do the same thing. I believe this meant that J.F. wanted Moore to provide him and K.T. the same amount of drugs as before. I further believe that the $7,250 was money for drugs because in calls between Moore and J.F., Moore said that K.T. was short on one of the "9-packs" that Moore gave her. I believe that "9-pack" is slang for nine ounces – a quarter kilogram – of cocaine. I also know that $7,250 is approximately the price for a quarter kilogram of cocaine.

82.    The next day, J.F. called Moore and asked when Moore wanted to meet her. They agreed to meet at noon. At about 9:54 a.m., Moore spoke with his suspected source (the man who lives at **Target Location J**). The source said he had the one that Moore likes. Moore said he would call back because he needed to pick up a little money. At about 10:51, Moore contacted K.T. and told her that he was not going to make it to meet her at noon because he (Moore) was not going to see "him" until 4 or 5. She agreed and told him that she had his "stuff." Moore and J.F. spoke later and J.F. said that "she" was waiting for Moore in West Oakland and that she had money for him. They agreed that she and Moore would meet the next day, November 25. On November 25, Moore and J.F. spoke again. J.F. said, "Aye Unk, you said you were going to meet her at 1:00 p.m." Moore responded, "No, they ain't call me yet, I'm

waiting on a call." J.F. asked why "she said Moore was going to meet her at 1:00 p.m. and Moore said, "Oh yeah I did, I was just going to pick up the money. I ain't got the thing yet." I believe this series of calls over multiple days reflects Moore's efforts to collect money for drugs he had fronted to J.F. before, but that Moore didn't want to pick up the money until he had more drug to supply her.

83.     On November 26, 2018, agents followed Moore when he went to meet his source. After what agents believe was a meeting with the source, Moore went to **Target Location I**. While traveling there, Moore and J.F. spoke. J.F. again said that his girlfriend had money for Moore, and Moore said that he was about to get his hair cut and that the thing was already there.

84.     I believe that K.T. resides at **Target Location R** because she is one of the subscribers for the utilities at that address. Moreover, on several occasions, surveillance units have observed both vehicles that K.T. drove to meet Moore (both of which are registered to his nephew, J.F.) parked outside **Target Residence R**.

### 18.     Target Vehicle 1

85.     This vehicle is registered to JAMES and/or Yolanda at 3677 Maybelle Ave. #3 in Oakland, CA. This appears to be a typographical error in typing Yolanda's actual address, which is 3667 Maybelle Ave., **Target Location E**. JAMES used this vehicle when selling guns or drugs to CI-1 on eight occasions, including most recently, on October 11, 2018, when he sold a half-kilogram of powder cocaine to CI-1.

### 19.     Target Vehicle 2

86.     This vehicle is registered to Moore's wife at **Target Location B**. Agents have observed Moore driving this vehicle on multiple occasions, including on May 2, 2018, when agents followed Moore from the barber shop (**Target Location I**) to D.D.'s apartment (**Target Location F**), on October 11, 2018, when I believe he supplied (through WALKER) the half-kilogram of powder cocaine that JAMES sold to CI-1, and on November 28, 2018, when agents saw him meet with the person I believe was his cocaine source.

///

### 20. Target Vehicle 3

87. This vehicle is pending registration. WALKER drove this vehicle on each of the occasions described above, when I believe he delivered cocaine to JAMES, prior to JAMES selling those drugs to CI-1.

### 21. Target Vehicle 4

88. This vehicle is registered to JAMES at **Target Location A.** JAMES drove this car to the deal on June 18 and July 31, 2018, when he sold guns to CI-1.

### 22. Target Vehicle 5

89. This vehicle is registered to WALKER at **Target Location G.** WALKER drove this vehicle on October 11, 2018, when he met with Moore at **Target Location L,** prior to the half-kilogram cocaine deal between JAMES and CI-1.

### 23. Target Vehicles 6, 7, 8, and 9

90. **Target Vehicles 6 through 8** are registered to the same person. **Target Vehicle 9** is registered to a different person. That registered owner of **Target Vehicles 6 through 8** picked up Moore's suspected cocaine source in **Target Vehicle 6** on November 28, 2018 prior to the meeting with Moore in which I believe Moore and the source exchanged drugs for money. Though the suspected source left his home (**Target Location J**) in **Target Vehicle 6,** he arrived to meet with Moore driving **Target Vehicle 9.** After the deal, the suspected source arrived back at **Target Location J** in **Target Vehicle 7.** I know that drug traffickers often switch vehicles as a part of their counter-surveillance techniques because it makes it more difficult for law enforcement to follow their movements. I believe the suspected sources use of at least three vehicles on November 28, 2018, and the fact that two of them were registered to the same person, is consistent with the meeting being a drug deal and also with the source's taking precautions to avoid being identified and caught. In addition, agents have seen the suspected source driving **Target Vehicle 8** on multiple occasions, most recently on December 3, 2018. I know that the use of multiple vehicles, and vehicles registered to other persons, is a common technique that drug traffickers use to avoid detection. I also know that it is common for

traffickers to store drugs in vehicles – especially vehicles registered in others' names – to avoid being found with drugs in their own homes.

### 24. Target Vehicle 10

91.    This vehicle is registered to E.M. at **Target Location Q**. E.M. arrived at the November 26, 2018 meeting with Moore in **Target Vehicle 10**.

### 25. Target Vehicle 11

92.    I believe that RIVERA owns or has regular access to this vehicle. Agents have seen him in it multiple times while he is on Makin Road, and he was in it when law enforcement contacted him on December 12, 2018, as described above.

93.    Agents are presently unaware whether this vehicle is registered to someone and, if so, to whom, because the vehicle has paper plates. Agents have not attempted to ascertain the vehicle's VIN because doing so would require inspecting the VIN plate through the vehicle's windshield, and this would be obvious to anyone in the area, including RIVERA or his girlfriend. Doing so would therefore risk alerting RIVERA to the fact that he is the subject of an investigation. Agents will not attempt to search this vehicle unless, at the time they arrest RIVERA and search his residence, they find keys that appear to belong to this vehicle.

### 26. Target Vehicle 12

94.    I believe that STERLING owns or controls access to this car, because agents have observed STERLING occupying this vehicle on multiple occasions, and it is frequently parked outside the building where it appears that STERLING resides.

95.    Agents are presently unaware whether this vehicle is registered to someone and, if so, to whom, because the vehicle has paper plates. Agents have not attempted to ascertain the vehicle's VIN because doing so would require inspecting the VIN plate through the vehicle's windshield, and this would be obvious to anyone in the area, including RIVERA or his girlfriend. Doing so would therefore risk alerting RIVERA to the fact that he is the subject of an investigation. Agents will not attempt to search this vehicle unless, at the time they arrest RIVERA and search his residence, they find keys that appear to belong to this vehicle.

## E. KNOWLEDGE ABOUT DRUG AND GUN TRAFFICKERS GENERALLY

96. Based upon my training, experience, and consultation with other law enforcement officers, including officers involved in this investigation, I have learned the following:

a. Persons who are involved in drug and gun trafficking often store drugs, firearms, ammunition, magazines, silencers, gun cases, and spare parts and accessories for guns in their residences (including attached or unattached garages, storage sheds, back houses, and other structures) and vehicles in order to have them close at hand both to protect the drugs and themselves from others who may want to steal them, and also to be able to complete transactions quickly and easily. They also often store this contraband in the homes and vehicles of their trusted friends and family members to avoid being caught with the contraband themselves, and also to make it harder for law enforcement and rival traffickers to find;

b. Persons who traffic guns and drugs commonly keep in their residences and cars items which will tend to identify them and evince their control over those locations, including utility bills, lease agreements, rent receipts, canceled mail envelopes and cards, telephone bills, canceled checks, bank statements, savings account passbooks, deposit receipts, passports, diaries, social security cards, drivers licenses, vehicle registration and title papers, land titles, escrow papers, tax receipts, identification cards, photographs and keys. I know that these items can be important to help establish access to or control over a location where contraband is found, or where items like cell phones and other electronic devices are found;

c. Persons involved in gun and drug trafficking often maintain documents, notes, files, calendars and records, relating to their illegal activities, including: "pay-owe" sheets; lists of associates (including suppliers, customers, couriers, and other co-conspirators) and their contact information; records indicating the types, price, quantity, dates and/or times when drugs were sold or plan to be sold, including names, addresses, phone numbers, and related calendaring notations; financial records relating to the incoming and outgoing money associated with the purchase or sale of narcotics; and documents showing domestic and international travel associated with the transportation of narcotics, such as airline tickets, itineraries, passports, and

receipts showing travel such as airline receipts, car rental receipts, hotel receipts and fuel receipts. Such records, which are frequently encoded in order to protect those involved in the distribution activities, will often be maintained on their persons or in their residences, stash houses, businesses, and/or vehicles so that they are close at hand and readily available for the purposes of ascertaining current balances. These records are often stored electronically within the memory of computers, computer related storage devices (such as USB or "thumb" drives, CD ROMs, diskettes, external hard drives, iPods and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices. I believe this is particularly true from the many pictures displayed on the **Target Subjects'** Instagram accounts;

      d.     Persons involved in drug trafficking often have equipment and materials related to the processing, packaging, and distribution of drugs, including: scales and other weighing devices; packaging items such as baggies, paper bags, plastic bags, plastic storage containers, heat sealers and other packaging equipment; beakers, bowls and other glassware used to cook powder cocaine and turn it into cocaine base; gloves, masks and other personal protective equipment; diluents and other substances used to cut the drugs they sell, including mannitol, mannite, lactose, Vitamin B12, and MSM;

      e.     Persons involved in gun and drug trafficking often transport contraband in their vehicles;

      f.     Persons involved in drug trafficking often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. These individuals frequently maintain records relating to their use of these services, such as receipts, copies of airbills, and package tracking records accessed over the internet, on their person, at their residences, in structures at cultivation sites, stash houses, businesses, and/or in their vehicles, where they are available for reference;

g.      Persons involved in drug and gun trafficking maintain items indicating unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including records concerning currency, precious metals, and/or jewelry valued in excess of $1,000, documentation relating to the purchase of real estate or motor vehicles; records evidencing the establishment of shell corporations and/or business fronts; records, documents, or other evidence relating to the existence of wire transfers, cashier's checks, and money orders, travelers checks, bonds, stock certificates, passbooks, bank checks, bank deposit tickets, certificates of deposits, income tax returns, and memoranda and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money, money counting machines, money wrappers and bags. These items are often kept in the traffickers' residences, stash houses, businesses, and/or vehicles;

h.      Persons involved in gun and drug trafficking communicate with their associates, suppliers and customers using cell phones, smartphone apps, and online messaging functions through websites like Facebook and Instagram. They uses these methods to arrange the sales of guns and drugs, set quantities and prices, meeting places. I know that cell phones maintain records of these communications in the form of call logs and stored messages and voicemails. Cell phones also store information about the locations the phone has visited, and that can be useful in establishing that a meeting referenced in an electronic communication took place as described;

i.      Persons involved in drug and gun trafficking frequently take trophy photos and videos of the guns, drugs and money they have, and these photos and videos are often found on their cell phones and other electronic devices;

j.      Drug traffickers attempt to mask the distinct odors of particular drugs through the use of heat sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease.

///

///

## V.  CONCLUSION

97.    Based on my training and experience, my participation in this investigation, it is my opinion that there is probable cause to believe that the **Target Subjects** have violated the statutes listed above and that the **Target Locations** and **Target Vehicles** will contain evidence of these violations.  Therefore, I request that the Court issue complaints against the **Target Subjects** for the violations listed above, and warrants authorizing agents to search the **Target Locations** and the **Target Vehicles**, for the items listed in Attachment B, and according to the protocol in Attachment C.

## VI.    REQUEST TO SEAL SEARCH WARRANT

98.    I believe that, should the contents of this warrant and affidavit be made public, it would jeopardize this continuing investigation and any personnel assigned to, involved in or cooperating with this investigation.  I also know, based upon my training and experience, that if the subject of this investigation or his associates were notified that a criminal investigation exists, they would have the opportunity to destroy evidence, notify co-conspirators, or flee from prosecution, and/or attempt to locate and harm informants.  For the foregoing reasons, and because this is an ongoing investigation, I request that the complaints, warrants and the supporting materials be sealed until further order of the court, except that the Court order the Clerk of the Court to make copies available to representatives of the U.S. Attorney's Office, the

///
///
///
///
///
///
///
///

Bureau of Alcohol, Tobacco, Firearms and Explosives, and the Drug Enforcement
Administration for use in this case.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

_____

ATF Special Agent Whitney Hameth

Subscribed and sworn to before me this 9th day of January, 2019 in Oakland, California.

_____
HON. KANDIS A. WESTMORE
United States Magistrate Judge