1   DAVID L. ANDERSON (CABN 149604)
    United States Attorney
2
    HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   FRANK J. RIEBLI (CABN 221152)
    ERIN A. CORNELL (CABN 227135)
5   Assistant United States Attorneys
            1301 Clay Street, Suite 340S
6           Oakland, California 94612
            Telephone: (510) 637-3680
7           FAX: (510) 637-3724
            Frank.Riebli@usdoj.gov
8           Erin.Cornell@usdoj.gov
    Attorneys for United States of America
9

10                        UNITED STATES DISTRICT COURT

11                       NORTHERN DISTRICT OF CALIFORNIA

12                              OAKLAND DIVISION

13  UNITED STATES OF AMERICA,              )  Case No. CR 19-043 YGR
                                           )
14          Plaintiff,                     )
                                           )
15      v.                                 )  GOVERNMENT'S OPPOSITION TO
                                           )  DEFENDANT'S MOTION FOR PRETRIAL
16  CAMERON MOORE-WILLIAMS,                )  RELEASE DUE TO COVID-19
                                           )
17          Defendant.                     )  Date:   May 1, 2020
                                           )  Time:   1:30 p.m.
18  _____   )

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ...................................................................................................1

II.    PROCEDURAL BACKGROUND................................................................................1

III.   DISCUSSION ......................................................................................................2

     A.    Legal Standard ................................................................................................2

     B.    The COVID-19 Pandemic Does Not Warrant MOORE's Release. ...................................3

          1.    MOORE Has Shown He Is Not Amenable to Supervision......................................3

          2.    MOORE Does Not Have Special Susceptibility to COVID-19.............................7

          3.    MOORE's Release Plan May Mitigate His Risk of Exposure, Or It May Not. .........................................................................................9

          4.    Releasing MOORE May Increase His Mother's Risk of Exposure......................11

     C.    The Current Restrictions Do Not Infringe MOORE's Right to Counsel...........................12

IV.   CONCLUSION.....................................................................................................15

**TABLE OF AUTHORITIES**

Cases

Babu v. County of Alameda, 18-CV-07677 NC ....................................................................... 11

Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001) .................................................................. 13

Fed. Public Defenders of N.Y., Inc. v. Fed. Bureau of Prisons, 954 F.3d 118 (2d Cir. 2020) ................ 13

Johnson-El v. Schoemehl, 878 F.2d 1043 (8th Cir. 1989) ........................................................... 12

McMaster v. Pung, 984 F.2d 948 (8th Cir. 1993) ................................................................... 12

United States v. Cazares, N.D. Cal. Case No. CR 18-466 BLF ................................................ 3, 12

United States v. Cecrle, 2014 WL 31674 (D. Nev. Jan. 3, 2014) ................................................. 13

United States v. Clark, 2020 WL 1446895 (W.D. Pa. Apr. 17, 2020) ............................................. 6

United States v. Daniels, N.D. Cal. Case No. 19-709 LHK (NC) ............................................... 6, 7

United States v. Diaz-Hernandez, 943 F.3d 1196 (9th Cir. 2019) ................................................. 4

United States v. Dupree, 833 F. Supp. 2d 241 (E.D.N.Y. 2011) .................................................. 3

United States v. Gebro, 948 F.2d 1118 (9th Cir. 1991) ........................................................... 5

United States v. Hir, 517 F.3d 1081 (9th Cir. 2008) ......................................................... 3, 4, 5

United States v. Kidder, 869 F.2d 1328 (9th Cir. 1989) .................................................... 8, 10, 11

United States v. Motamedi, 767 F.2d 1403 (9th Cir. 1985) ..................................................... 3, 4

United States v. Wilson, 690 F.2d 1267 (9th Cir. 1982) .......................................................... 12

United States v. Winsor, 785 F.2d 755 (9th Cir. 1986) ........................................................... 4

Statutes

18 U.S.C. § 922(g)(1) ............................................................................................... 7

18 U.S.C. § 3142(e) .................................................................................................. 4

18 U.S.C. § 3142(e)(1) .............................................................................................. 3

18 U.S.C. § 3142(f) .................................................................................................. 6

18 U.S.C. § 3142(f)(2)(B) ........................................................................................... 4

18 U.S.C. § 3142(g) .................................................................................................. 4

18 U.S.C. § 3142(i) ............................................................................................ 3, 6, 12

## I.      INTRODUCTION

Cameron MOORE-Williams brings an emergency motion for release from custody because of his fear of contracting COVID-19 while in Santa Rita Jail.  He has no special susceptibility to the illness.  He is young and healthy.  And he has proven that he is not amenable to supervision.  He was out of custody for just two months before the Court remanded him back into custody.  Perhaps because of these undisputed facts, he bases his request on inaccurate data, unsupportable speculation, and unwarranted accusations that the government likely will oppose his motion because it is unthinking and mean.  The government opposed MOORE's release on bail a year ago because the government believed he was a danger to the community and a flight risk.  The government opposes MOORE's release now because the current COVID-19 pandemic has not made him less of a danger or flight risk – indeed, he has greater incentive to flee now than he did before – and because his request has no legal merit.  MOORE also argues that his confinement has "gutted" his Sixth Amendment right to counsel by preventing in-person meetings.  Like the rest of his arguments, this is unhelpful hyperbole.  MOORE admits he can still communicate with his attorneys by telephone and videoconference, and he may have non-contact visits with them in glass-partitioned rooms.  Moreover, he has agreed to delays exceeding a year so far, because it suited him to do so.  He cannot now complain about a short additional delay.  For all of these reasons, the government opposes his request for release.[1]

## II.     PROCEDURAL BACKGROUND

On January 24, 2019, a federal grand jury issued an indictment charging MOORE and others in a large-scale conspiracy to sell crack cocaine.  Oakland police arrested MOORE in the early hours of April 25, 2019 as he and others were involved in the burglary of an auto shop on Foothill Boulevard in

---

[1] MOORE makes the inflammatory statement that the government will oppose his request, not because of any individualized consideration of his case, but because opposing release is just an unthinking reflex for government lawyers.  Mot. at 9.  As the rest of this brief demonstrates, the government has given consideration to MOORE's "unique circumstances."  As for the argument that the government has opposed all but one request for release, MOORE forgets that no one gets detained in the Northern District by accident.  The people whom the Court has detained or remanded to custody following a period of release have demonstrated beyond any doubt that they are real dangers to the community and/or flight risks.  Moreover, they are all accused of felonies, unlike many of the people being released from the jail.  It should not be a surprise that the government has opposed release when it has.

Oakland.  MOORE appeared in federal court late that morning, and then again on May 1, 2019, for a bail hearing.  At that hearing, the government requested that the Court detain MOORE as both a danger and a flight risk.  Pre-Trial Services recommended release on a $75,000 unsecured bond, and that MOORE live in a halfway house.  Pre-Trial considered whether MOORE should reside at his mother's house but advised against it because "it does not appear her presence in his life has curbed the defendant's willingness to engage in criminal conduct."  The Court agreed to release MOORE, but required that his sister – not his mother – act as custodian until a space opened for him at the halfway house.  See Dkt #93.  MOORE was released and immediately went to the halfway house.

A month later, he was back before the Court because he had violated the halfway house's rules and then become belligerent with house staff when they challenged him for the violation.  See Dkt #114. It was a simple rule violation – he brought food back to his room when he should not have.  MOORE escalated the incident into a verbal altercation – he repeatedly refused requests to return the food to the kitchen and yelled at the staff to "get the f%$# out of [his] room" – that required additional staff to respond.  Pre-Trial noted its concern over his behavior and said that, if he were terminated from the halfway house, "Pretrial Services does not believe there would be any other appropriate placement or conditions to adequately mitigate the risks posed by this defendant."  Pre-Trial further advised that it might have to recommend remand if MOORE were terminated from the halfway house.  Pre-Trial did not consider moving him to his mother's house.  The Court ordered a hearing on MOORE's violation. MOORE was a half-hour late for the hearing.  The Court allowed him to remain out of custody.

Two weeks after that hearing, MOORE again violated the halfway house's rules.  He returned from a mental health counseling appointment almost two hours later than scheduled.  When the halfway house staff confronted MOORE about his tardiness, he stated that he no longer wanted to live there and preferred to just go into custody.  The Court remanded him on July 2, 2019.  See Dkt #127.  Thus, MOORE was only out of custody for two months before being remanded back into custody.

## III.    DISCUSSION

### A.    Legal Standard

MOORE asks for "temporary" release because of the risk that he might contract COVID-19

while in jail, and because being in jail makes it harder for him to prepare his defense.  The Court may permit the "temporary release" of a defendant to the extent that release is necessary "for preparation of the person's defense or for another compelling reason."  18 U.S.C. § 3142(i).  Once a defendant has been ordered detained, it is the defendant who must show that temporary release is necessary under Section 3142(i).  United States v. Dupree, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011).

MOORE does not actually seek temporary release.  He cites to § 3142(i), but he doesn't ask for release for any defined period or purpose.  Rather, he seeks release pending the resolution of his case.  There is nothing temporary about his request.  Thus, he is ineligible for release under § 3142(i).

Courts around the nation have considered four factors in determining whether the possibility of contracting COVID-19 in jail warrants release:  (1) the original grounds for detention; (2) the specificity of the defendant's COVID-19 concerns; (3) the extent to which the proposed release plan mitigates the COVID-19 risks to the defendant; and, (4) the likelihood that release would increase COVID-19 risks to others.  See, e.g., United States v. Cazares, N.D. Cal. Case No. CR 18-466 BLF (Dkt #351 Apr. 23, 2020) (granting motion to revoke release where defendant was a danger to the community and not in a high-risk category) (collecting cases).

### B.     The COVID-19 Pandemic Does Not Warrant MOORE's Release.

Responding to MOORE's motion is difficult because it is 18 pages of mistaken facts and unsupportable conclusions and accusations.  Merely correcting the record could consume more time than the Court has given the government to respond, and ultimately would distract from the Court's work of evaluating whether MOORE has met his burden to show that release is warranted here.  Thus, the government will say only that it does not accept as true anything MOORE has said, beginning with his oft-repeated but completely wrong statement of how many cases of COVID-19 there are in the jail.

### 1.     MOORE Has Shown He Is Not Amenable to Supervision.

The Bail Reform Act of 1984 permits pretrial detention where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  Detention is appropriate where the defendant is either a danger to the community or a flight risk; it is not necessary to prove both.  United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985).  The government must prove danger by clear and

1   convincing evidence, and flight risk by a preponderance.  18 U.S.C. § 3142(f)(2)(B); Motamedi, 767

2   F.2d at 1406.  Categorical grants or denials of bail—untethered from an individualized determination—

3   are impermissible.  See United States v. Diaz-Hernandez, 943 F.3d 1196, 1199 (9th Cir. 2019).  Where,

4   as here, there is probable cause to believe that the defendant committed a drug trafficking offense with a

5   statutory maximum exceeding ten years, there exists a rebuttable presumption that "no condition or

6   combination of conditions of release will reasonably assure the appearance of the person as required and

7   the safety of the community."  18 U.S.C. § 3142(e).  Even when rebutted, however, the presumption

8   does not disappear; it still carries evidentiary weight.  "The presumption is not erased when a defendant

9   proffers evidence to rebut it; rather the presumption remains in the case as an evidentiary finding

10  militating against release, to be weighed along with other evidence relevant to factors listed in

11  § 3142(g)."  United States v. Hir, 517 F.3d 1081, 1086 (9th Cir. 2008).[2]

12          The Court considers four factors in determining whether the pretrial detention standard is met:

13  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the

14  defendant; (3) the history and characteristics of the defendant, including the defendant's character,

15  physical and mental condition, family and community ties, past conduct, history relating to drug or

16  alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as

17  whether the crime was committed while the defendant was on probation or parole; and (4) the nature and

18  seriousness of the danger to any person or to the community that would be posed by the defendant's

19  release.  18 U.S.C. § 3142(g); United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986).  Considering

20  factors outside of those set forth in Section 3142 is disfavored.  Diaz-Hernandez, 943 F.3d at 1199.

21          MOORE was an armed drug dealer.  He and others worked for co-defendant Daniel James.

22  James operated a 24/7 open-air drug and gun market on Makin Road in Oakland.  Pole camera and body

23  camera footage, wire intercepts, and MOORE's own social media postings, show him on Makin Road

24  selling drugs on multiple occasions.  The indictment only charges MOORE with (B)-weight conspiracy,

25

26          [2] MOORE argues that he rebutted the presumption of detention at his initial bail hearing, and
27  thus that the Court should treat the presumption as having been rebutted in these proceedings.  Mot. at 8.
    To the contrary, the presumption against release remains a factor the Court must consider, and
28  MOORE's behavior after the Court released him the first time makes it that much harder for him to
    rebut it this time.

but the quantities MOORE's associates sold on that block are staggering: over a dozen kilograms of crack cocaine in a 14-month period, sold a few tenths of a gram at a time. That represents between 35,000 and 40,000 hand-to-hand transactions, approximately one every 15 minutes of every day and night, rain or shine, all concentrated in a single East-Oakland neighborhood. MOORE participated in the destruction of a community.[3]

Moreover, though the indictment only charges the drug conspiracy, MOORE also armed himself. MOORE sold an informant a pistol while on that same block of Makin Road on January 31, 2018, and posted images of himself on social media with other pistols. During the deal in January 2018, MOORE was hanging out with co-defendants Paul Rivera and Daniel James and others in the same drug dealing spot on Makin Road where River and James were selling drugs and where MOORE himself sometimes sold drugs for James. Whether he was selling drugs that day is unclear. But when the informant asked to buy a gun, MOORE left and came back a minute or so later with the gun in his waistband. The short interval of time needed to retrieve the gun indicates it was close by. And it was loaded, with a round in the firing chamber, meaning it was ready to be used. After MOORE sold the informant his gun, Rivera told MOORE that "Tay" (meaning Deantae Kennedy-Palmer) could sell him another. This indicates that MOORE was not giving up guns for good, just finding a way to make a profit on them while remaining armed. Indeed, his social media posts after that transaction show him with other pistols and with others who were trimming marijuana and flashing firearms. See Attachment.

The evidence against MOORE is overwhelming. He is captured on a pole camera and in wire intercepts selling drugs. He is also captured on video selling the gun to the informant. Although the Ninth Circuit treats this as the least important factor, the Court must still consider it, because it can help establish dangerousness, Hir, 517 F.3d at 1090 (finding that "the weight of the evidence clearly and convincingly establishe[d]" a likelihood that the defendant would pose a danger if released), and risk of

---

[3] MOORE calls himself a low-level player in this conspiracy, and a "non-violent drug offender." This term, "non-violent drug offender," gained fashion several years ago among those opposed to drug prosecutions in general, and it is meant to suggest that drug prosecutions are targeting the Jeff Spicolis of the world and condemning them to prison for smoking a little weed. The truth is that drug dealers poisoned 67,367 people to death in 2018. See https://www.cdc.gov/drugoverdose/data/ statedeaths.html (last visited Apr. 29, 2020). It's hard to call such a profession "non-violent." MOORE may have been just a street dealer, but that does not make the harm he caused other families less real.

flight, <u>United States v. Gebro</u>, 948 F.2d 1118, 1122 (9th Cir. 1991) (overwhelming evidence of the defendant's guilt "makes it more likely that he will flee"). Here, the strength of the evidence is especially salient because the government conducted a reverse proffer for MOORE and showed him just how strong the evidence against him was. As part of that reverse proffer, the government also showed MOORE how it calculates his Sentencing Guidelines exposure. The possibility of several years in prison is now even more real to MOORE than at the time he was remanded to custody, and he has a correspondingly greater incentive to flee.

MOORE's history, including his performance while on release in this case, demonstrate that he is not amenable to supervision. He has 10 years of criminal history, beginning when he was a juvenile. It appears from the pre-bail report that he has been granted probation on five occasions, and he violated all five grants of probation. It appears he was on probation when he committed the offense charged in this case. The day before he was arrested in this case, he fled from the California Highway Patrol in a car in the Eastern District, even though his license was revoked for four separate failures to appear on traffic-related matters and he should not have been driving at all. He was arrested in this case when Oakland police caught him and three others attempting to burglarize an auto shop in Oakland – in that incident as well, he attempted to flee. One would think that narrowly escaping capture in the Eastern District would dissuade him from joining in a burglary attempt the very next night, but it did not.

Moreover, the Court gave MOORE a chance to prove himself on pre-trial release a year ago. MOORE showed once again that he could not follow even simple rules like not taking food out of the kitchen and returning to the halfway house on time. And when confronted, he became belligerent. Within two months of release, he was back in custody.

Nothing about the COVID-19 pandemic changes these facts. <u>See</u> <u>United States v. Clark</u>, 2020 WL 1446895, at *3 (W.D. Pa. Apr. 17, 2020) ("A defendant's concerns that he or she would face heightened COVID-19 risks if incarcerated would not typically factor into a § 3142(f) analysis, which focuses on whether the court can fashion conditions of release that will reasonably assure the defendant is not a risk of nonappearance or a risk of harm to any others or the community. The risk of harm <u>to the</u> <u>defendant</u> does not usually bear on this analysis. Rather, whether a defendant's particular circumstances warrant release in light of the COVID-19 pandemic ought to more properly considered on a case-by-

1  case basis under the "another compelling reason" prong of § 3142(i) . . . .").[4]  MOORE will behave the

2  same way he did before if the Court releases him again.  The difference is that no one will find out about

3  it because Pre-Trial Services in the Northern and Eastern Districts are severely limited in the supervision

4  they can provide.  They cannot, for example, provide any drug testing.  And electronic monitoring is

5  done remotely without setting up any on-site equipment – it is not clear that it provides any assurance

6  that MOORE is where he is supposed to be, except when Pre-Trial checks in with him.

7       MOORE's request to reside with his mother provides no assurance.  As Pre-Trial concluded a

8  year ago, she lacks the moral suasion necessary to keep him from committing crimes.  MOORE argues

9  that she would be able to supervise him now because she is older and not presently working.  First, as

10  Pre-Trial concluded and the Court worried during the original hearing, MOORE grew up not following

11  whatever guidance his mother attempted to provide.  It was for this reason that the Court rejected her as

12  a custodian and instead asked MOORE's sister to fill that role.  MOORE is now a grown man with over

13  a decade of repeated criminal behavior.  To think that he would suddenly submit to his mother's positive

14  influence is wishful thinking, at best.  She never established that kind of relationship with him before

15  and does not have it to fall back on now.  If he lives with his mother, he will do as he pleases.

16       MOORE's inability to comply with the conditions of release for even a month only confirm what

17  the government argued at his initial bail hearing:  he is not amenable to supervision and this makes him

18  a danger to the community; and his efforts to avoid capture show he is a flight risk.  This factor thus

19  weighs against release.

20               **2.     MOORE Does Not Have Special Susceptibility to COVID-19.**

21       The second factor the Court considers is whether MOORE has a pre-existing health condition

22  that puts him at higher risk of serious illness if he does contract COVID-19.  According to the CDC,

23

24       [4] MOORE cites to a release order in United States v. Daniels, N.D. Cal. Case No. 19-709 LHK

25  (NC) (Dkt #24, Apr. 9, 2020).  Mot. at 9-10.  MOORE admits that the defendant there had a health
   condition (severe obesity) that put him at greater risk of severe illness if he contracted COVID-19, and

26  thus (according to the release order) had a greater incentive to comply with public health orders
   regarding sheltering in place.  MOORE has no such concerns.  MOORE also asserts that the defendant

27  in Daniels had been "accused of a violent offense."  Not true.  He was charged with unlawful firearm
   possession (18 U.S.C. § 922(g)(1)).  Further, we are now three weeks past the date of that order and the

28  data from the jail, discussed herein, indicate that many of the fears about unrestrained spread in the jail
   that existed at that time have proven to be unfounded.

most cases of COVID-19 are mild. <u>See</u> https://www.cdc.gov/ coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html ("Most people with COVID-19 have mild illness and can recover at home without medical care."). Persons who have one or more of several specific health conditions – such as moderate to severe asthma, serious heart conditions, compromised immune systems, and persons older than 65 – are at risk of severe illness if they contract COVID-19. <u>See</u> https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Apr. 28, 2020).

MOORE admits that he does not have any of these conditions. Mot. at 11:2-4. To the contrary, he is young and healthy. This means that, compared to others at Santa Rita and in the community, MOORE is at lower risk of serious complications. He does not "face[] the very real possibility of death," Mot. at 8:21-22, and the decision to remand him was not "intended to sentence Mr. Moore-Williams to death," <u>id.</u> at 11:4-6. Those statements are just hyperbole. Especially now, the Court should disregard hyperbole insist on fact-based arguments.

Indeed, MOORE does not contend that Santa Rita Jail has denied him adequate medical care for any health condition that he has, or that the jail would be unable to provide adequate medical care if he should contract the illness.[5] <u>Cf.</u> <u>United States v. Kidder</u>, 869 F.2d 1328, 1330–31 (9th Cir. 1989) (to prevail on Eighth Amendment claim regarding avoiding prison due to medical condition, defendant "must show that <u>no</u> constitutionally acceptable treatment can be provided while he is imprisoned" and collecting cases). To the contrary, there is every reason to believe that, if MOORE did contract COVID-19, the jail would be able to provide him adequate treatment – either on-site if his case is mild, or in a community hospital if his case becomes more serious. The jail's record so far suggests that it can. Of 35 inmates who have tested positive while in custody so far, 25 have recovered completely.[6] <u>See</u> https://www.alamedacountysheriff.org/admin_covid19.php (last updated Apr. 29, 2020). There are only nine positive cases currently in the jail. No inmates have died.

This factor weighs against release.

---

[5] MOORE argues that he is entitled to adequate medical care, and that the jail has not eliminated the risk that he might contract COVID-19. Mot. at 12-13. The first part is true. The second part is a non sequitur, and something no one can guaranty him, whether he is in or out of custody.

[6] One inmate was released from custody while positive. There is no further data on that person.

**3.     MOORE's Release Plan May Mitigate His Risk of Exposure, Or It May Not.**

The Court also considers the extent to which MOORE's release plan will mitigate his risk of exposure to the virus.  MOORE argues that he is "more likely to contract COVID-19 if he's at Santa Rita jail than quarantined at his mother's house," because there have been 53 cases of COVID-19 so far at the jail.  Mot. at 8-9.  First, MOORE is wrong about the number of cases.  This is important because he repeats this mistake throughout his brief.  As of the date he filed his brief, there had been 35 cases, not 53.  As of the government's filing, there have been 35 cases, the same number as when MOORE filed his brief.  See https://www.alamedacountysheriff.org/ admin_covid19.php (last visited Apr. 29, 2020).  It is not possible to overstate the significance of this fact.  For almost the past 10 days, there has been an increase of only two cases.  That represents about a 6% increase over 10 days.  In that same period, California has experienced at least a 53% increase statewide.  See https://update.covid19.ca.gov/ #top (last visited Apr. 30, 2020).  The data show that it is indisputably false to say that the virus is spreading unrestrained, or even that it is spreading much at all, at Santa Rita.

Second, it is impossible to predict the relative risk of exposure in or out of custody with a subject who does not follow instructions.  There is no reason to assume that MOORE would have a lower risk of infection out of custody because he would be perfectly compliant with public health recommendations when he was unable to comply with even simple regulations of a halfway house for a month.  Indeed, in some cases, defendants argue that their special susceptibility to COVID-19 provides added incentive to follow shelter-in-place rules.  MOORE cannot even claim that motivation because he has no special susceptibility to the illness.

Third, assessing the relative risk of exposure is difficult because the rate of testing at Santa Rita jail appears to be much higher than the rate in the community generally.  To date, Santa Rita has tested 106 inmates.  Over a population that has decreased from 2,597 to 1,757 (as of April 29, 2020), that is a rate of 40-60 per 1,000 persons.  According to published reports, California's statewide testing rate was only 7 per 1,000 persons as of April 20th, see Woolfolk, J., "Report: California has third-lowest U.S. coronavirus testing rate," S.J. Mercury News (Apr. 20, 2020), found at https://www.mercurynews.com/ 2020/04/20/report-california-has-third-lowest-u-s-coronavirus-testing-rate/ (last visited Apr. 27, 2020), and has only recently doubled, see https://covidtracking.com/data#state-ca (last visited Apr. 27, 2020).

Even at the new higher rate of testing, an inmate at Santa Rita is 3 to 4 times more likely to get tested than someone in the community.  That difference in testing distorts any attempt to assess the relative risks of exposure in custody versus out of custody.  Indeed, two different sets of researchers announced preliminary results indicating that the number of people in the community who have been exposed to coronavirus appears to be dozens of times higher than the number of confirmed cases public health departments are able to report.[7]  If these results are validated, then it means that the lack of testing has made the risks of exposure out of custody appear artificially low – dramatically low.  This is significant because it means that the actual risk of contracting the disease out of custody is much higher than simple math (number of reported cases/total population) might indicate.  And this means, in turn, that releasing MOORE will provide little additional protection from the illness.

Fourth, the increased testing in the jail matters because Santa Rita Jail also has put in place extensive measures to control the spread of coronavirus where it is detected, and the data indicate that those measures are working.  The Sheriff decreased the jail population by over 32% between March 1, 2020 and the present.  See https://www.alamedacountysheriff.org/admin_covid19.php (last visited Apr. 29, 2020).  The jail is designed to hold about 4,000 inmates, but currently holds only 1,757.  Id.  This decreases crowding in the jail and assists in creating more space between individuals.  The Sheriff requested that local police agencies cite and release all but violent offenders, and this has "greatly reduced" the numbers of bookings.  Id.  This not only helps keep the jail's population down, it also limits the number of people coming into the jail who might bring the virus in with them.  And the jail suspended in-person family and legal visits.  Id.  These measures also help prevent the virus from entering the jail.

Further, the inmates live in separate housing units.  The jail quarantines an entire unit when one inmate in a unit tests positive, and implements extra controls around movements into and out of quarantined units to prevent the spread of the illness from one unit to the next.  Though it may be harder

---

[7] See "COVID-19 Antibody Seroprevalence in Santa Clara County, California," available at https://www.medrxiv.org/content/10.1101/2020.04.14.20062463v1 (last visited Apr. 23, 2020) (50-85 times higher); "USC-LA Count Study:  Early Results of Antibody Testing Suggest Number of COVID-19 Infections Far Exceeds Number of Confirmed Cases in Los Angeles Count," available at http://publichealth.lacounty.gov/phcommon/public/media/mediapubdetail.cfm?unit=media&ou=ph&prog=media&prid=2328 (last visited Apr. 27, 2020) (28-55 times higher).

1  for inmates within a housing unit to maintain social distance from each other, the jail's outbreak control

2  measures help maintain social distance between housing units.  This situation is not dissimilar from a

3  family sheltering in place (or the new practice, called "quaranteaming," in which two or more families

4  shelter in place together): its members have lots of contact with each other, but limited contact with

5  other groups and that's how they stay safe.

6       The jail also has taken steps to provide some distancing between members of a single housing

7  unit.  It has educated the inmates about distancing, distributed masks for all inmates and staff members

8  to wear, enhanced its cleaning schedule, and given the inmates extra soap to facilitate hand-washing and

9  general cleanliness.  The jail also screens all staff members before they begin work each day.

10       The measures Santa Rita has implemented are exactly the measures the CDC recommends for

11  incarcerated or detained persons.  See https://www.cdc.gov/coronavirus/ 2019-ncov/community/

12  correction-detention/guidance-correctional-detention.html#management (last visited Apr. 23, 2020).

13  The Sheriff is aware of that guidance and has been implementing it to the extent practicable in the Santa

14  Rita jail, including many of the measures described above.  Indeed, the jail's COVID-19 information

15  page has a link to the document.  See https://www.alamedacountysheriff.org/ admin_covid19.php (last

16  visited Apr. 30, 2020).  In the class action currently pending before this Court, Babu v. County of

17  Alameda, 18-CV-07677 NC, the parties recently filed a joint statement in which they agreed that

18  "Alameda County Public Health has closely reviewed and approved Santa Rita Jail's COVID-19

19  Outbreak Control Plan.  Alameda County Public Health continues to be involved in the Outbreak

20  Control Plan, receives updates as the Plan evolves, provides input if necessary, and must approve any

21  changes before implementation."  Id. Dkt #103 at 2-3 (Apr. 16, 2020).  In their separate statement,

22  plaintiffs conceded that, "at this time, Santa Rita Jail does not appear to be seeing a continued surge in

23  new cases."  Id. at 10.  Two weeks later, the data show that this has remained true.  In other words, the

24  jail's infection control measures are working.

25       Once again, the facts belie MOORE's every attempt to paint Santa Rita as an overcrowded, fetid

26  environment where the coronavirus rampages unrestrained.  This factor also weighs against release.

27       **4.**     **Releasing MOORE May Increase His Mother's Risk of Exposure.**

28       The Court also considers whether releasing MOORE will increase the risk that others will

1   contract COVID-19.  It will.  MOORE's housing unit is currently under quarantine because one or more

2   of its residents has tested positive for the illness.  MOORE argues – though it is not possible to confirm

3   this – that his cellmate is exhibiting symptoms of COVID-19.  If what he says is true, then it is likely

4   that he has already been exposed.  Releasing him to live with his mother will increase the risk that she

5   too contracts COVID-19.

6          Releasing MOORE would also increase the risk of exposure to the Pre-Trial Services officers

7   from the Northern District of California who would have to go to MOORE's mother's house and set up

8   any electronic monitoring equipment the Court required.  See, e.g., Cazares, N.D. Cal. Case No. CR 18-

9   466 BLF (Apr. 23, 2020).

10         This factor also weighs against release.

11         None of the four factors the Court considers weigh in favor of release here.  MOORE is no more

12   amenable to supervision how than he was a year ago.  He has no special health concerns that might

13   cause him to experience the illness more severely if he contracts it.  The data – not rank supposition –

14   show that releasing him will not necessarily provide him any greater protection.  Indeed, he may already

15   have been exposed, and if so, releasing him will put others in the community at greater risk, including

16   his mother and anyone who interacts with either of them.  And he has made no showing that the jail is

17   incapable of providing him adequate medical care.  There is thus no basis for releasing him.

18         **C.     The Current Restrictions Do Not Infringe MOORE's Right to Counsel.**

19         MOORE also argues that the current conditions of confinement have "gutted" his Sixth

20   Amendment right to counsel.  A defendant has constitutional rights to assistance of counsel and

21   meaningful access to courts.  United States v. Wilson, 690 F.2d 1267, 1271 (9th Cir. 1982).  But there

22   are many permissible means of achieving those objectives.  See id. at 1271.  "While prisoners have a

23   general right to consult with their legal counsel, that right is not absolute . . . ."  McMaster v. Pung, 984

24   F.2d 948, 953 (8th Cir. 1993) (finding ban on contact visits with one of defendant's attorney, and

25   limitation to "telephonic contact and consultation through the mails" did not violate defendant's Sixth

26   Amendment rights).  A defendant's access to his or her attorney may be burdened by regulation or

27   practice of his penal institution, if justified by legitimate interests of penal administration.  Johnson-El v.

28   Schoemehl, 878 F.2d 1043, 1052 (8th Cir. 1989).  Courts considering whether release is necessary for a

1  person's defense under § 3142(i) have considered:  "(1) the time and opportunity the defendant has to

2  prepare for the trial and participate in his defense, (2) the complexity of the case and volume of

3  information, and (3) expense and inconvenience associated with preparing while incarcerated."  United

4  States v. Cecrle, 2014 WL 31674, at *4 (D. Nev. Jan. 3, 2014).  MOORE doesn't cite a single case

5  where a court said that temporary suspension of contact visits infringes on the right to counsel.[8]

6       MOORE argues that he has suffered a "complete disruption of his right to counsel" because the

7  jail suspended contact visits as of March 20, 2020.  Mot. at 17.  This argument fails for several reasons.

8  First, MOORE's counsel notified that government by email even prior to March 20, 2020 that she was

9  unwilling to go to the jail for a contact visit because of the risk of contracting COVID-19.  So it wasn't

10 the jail's suspension of contact visits that disrupted MOORE's ability to meet with his counsel, it was

11 his counsel's own (reasonable) decision not to visit the jail.  Second, given this (reasonable) view, it is

12 unlikely that they would have contact visits even if MOORE were released.  Indeed, if they did meet in

13 person, it would have to be at a distance of at least six feet and they would have to shout to each other

14 from across the room.[9]  So releasing him would not repair the disruption he claims he faces.  Third,

15 MOORE may still speak with his attorney by telephone or video conference.  MOORE claims he can't

16 do this because of the possibility that someone may listen in.  He has no basis for this contention, he just

17

18

19 [8] In MOORE's principal case, Fed. Public Defenders of N.Y., Inc. v. Fed. Bureau of Prisons, 954
   F.3d 118, 134 (2d Cir. 2020), the Second Circuit expressly did not reach the Sixth Amendment question.

20 And that case had nothing to do with temporary suspension of contact visits due to the coronavirus
   pandemic.  To the contrary, it dealt with the BOP's violation of its own regulations in suspending all

21 attorney visits on three occasions in January and February 2019 – the first, due to the government shut
   down, the second due to a facilities problem, and the third due to a confrontation between BOP officials

22 and people waiting in the facility's lobby.  What the Federal Defenders sought was injunctive relief
   requiring the BOP to resume daily visitation hours.  They did not seek the release of any prisoners.  This

23 case could not be less applicable to MOORE's circumstances.  In Benjamin v. Fraser, 264 F.3d 175,
   187-88 (2d Cir. 2001), the Second Circuit upheld a decision to leave parts of a consent decree in place,

24 including a part that dealt with attorney visits.  There, the evidence showed that there was no scheduling
   system for attorney visits, so that attorneys could not plan for visiting times, there were frequently long

25 delays, and at certain, unannounced periods of the day, visits with attorneys were disallowed even
   though family visits were permitted.  Id. at 179-80.  The only relief ordered was continued court

26 supervision of the attorney visit system – the plaintiffs didn't seek the release of any detainees and the
   court did not order anyone released.  Here, the jail has suspended all contact visits, attorney and family

27 visits, but only contact visits.  The suspension is temporary and clearly related to a legitimate public
   safety interest.  All other forms of communication, including non-contact visits, are allowed.  Once

28 again, this case could not have less applicability to MOORE's circumstances.

   [9] MOORE presumably wouldn't adhere to that rule, but his counsel most likely would.

states it.[10]  And it's contrary to the undersigned government counsel's experience with other defendants, including some in this case:  their counsel have reported numerous conversations with them; at least two defendants were calling their attorneys daily and they were having substantive conversations.[11]  They managed to work it out; MOORE could too if he wanted to.  He appears more interested in manufacturing obstacles to make his claim appear to have some substance.  Fourth, the jail still permits non-contact visits in a glass-partitioned room in the jail.  Thus, they can meet, face-to-face, and closer to each other than they could get in a conference room if MOORE were out of custody.  Fifth, whether he is in or out of custody, MOORE will not have 24/7 access to his attorney.  She has other clients and other commitments, both professional and personal.  Sixth, the current court closures have effectively stalled all proceedings, including in this case.  Unfortunately, other than motions such as this, nothing is happening.  So to the extent that MOORE's difficulties communicating with his attorney have made preparation slower, that is a temporary condition that every defendant faces.  MOORE already has agreed to over a year of excusable delay in this case.  He cannot complain that a short additional delay – just over a month as of now – is causing him prejudice.  Seventh, MOORE and the government had traded drafts of a plea agreement and had been very close to a resolution.  This would tend to indicate that there is little preparation left to do, contrary to his claim that he needs to be out of custody to mount an effective defense at trial.

MOORE no doubt has a Sixth Amendment right to counsel.  Yet for all the cases he cites in support of his argument that the current suspension of contact visits infringes that right, he cites not a

///

///

///

///

---

[10] MOORE claims that "Santa Rita has a rich history of listening to and recording attorney-client phone calls."  Mot. at 16.  To support such a salacious claim, he cites one newspaper article about a single deputy who recorded a live visit in an interview room, not a telephone call.  If anything, this undermines MOORE's claim that contact visits are more private than phone calls.  If the government made such a sweeping claim based on a single incident, the Court would (rightly) give the offending government counsel a stern reprimand on leaping to unsupported (and unsupportable) conclusions.

[11] This led one defense attorney – who shall remain nameless – to bemoan ever having given the defendant his/her personal cell number.

single case that holds that a temporary suspension of face-to-face visits – where other means of communicating are available – is so significant as to require release.  This argument has no merit.

**IV.     CONCLUSION**

For the foregoing reasons, the government asks that the Court deny MOORE's motion.

DATED:  April 30, 2020                                    Respectfully submitted,

                                                         DAVID L. ANDERSON
                                                         United States Attorney


                                                         _____
                                                                    /s/
                                                         FRANK J. RIEBLI
                                                         ERIN A. CORNELL
                                                         Assistant United States Attorney

Attachment





 **str8paperchase**
str8paperchase started a live video.



Liked by **officialacerico**, **smokeyred_malitia** and **45 others**

scootfromdag98 💯 💯 👌 👌 🌲 🌲 #cleanupcrew 💸 💸 #youngkings🙌

US-001415



US-001416





   

Liked by **jalina.ks** and **18 others**

**ntbangabang** ALil #Sticky #ShuckShucks

View 1 comment

FEBRUARY 17, 2014

    

US-001417







Liked by **trillyounginkd, jalina.ks** and **15 others**

**ntbangabang** Check Check

AUGUST 11, 2017



US-001418



US-001419

11:54

ntbangabang



Liked by **smokeyred_malitia**, **freakyteamvc** and **26 others**

ntbangabang "My nigga was Robbin & Poppin Tops & He Never tell me bout it. What you mean, Why you didn't pay for this Beat cause I'm a mf Robber" -KodakBlack

View all 3 comments

ntbangabang @flex2drippy what's good bro

smokeyred_malitia #Ganginhere

US-001420



US-001421

















US-001431